511 S.E.2d 139

**STATE of West Virginia, Appellee,**

v.

**Robert HAGER, Appellant.**

**No. 25172.**

Supreme Court of Appeals of West Virginia.

Submitted Nov. 12, 1998.

Decided Dec. 10, 1998.

Cecil C. Varney, Esq., Varney Law Office, Williamson, West Virginia, Attorney for Appellant.

Darrell V. McGraw, Jr., Esq., Attorney General, Scott E. Johnson, Esq., Senior Assistant Attorney General, Charleston, West Virginia, Attorneys for Appellee.

PER CURIAM:

Mr. Robert Hager (hereinafter "Mr. Hager" or "Appellant") appeals his first-degree murder conviction and his sentence of life without mercy in the Circuit Court of Mingo County. Mr. Hager alleges that the lower court erred in admitting his confession and in admitting evidence of other crimes. He also asserts prosecutorial misconduct and improper cross-examination by the prosecutor. We affirm the decision of the lower court.

### I. Facts

On September 23, 1995, seventeen year-old Ms. Della Jean Lacy was murdered. Mr. Hager surrendered himself to Kermit City Police on September 26, 1995, and the police questioned him regarding the murder of Ms. Lacy and the murder of Mr. Sherman Cisco. Subsequent to the reading of Mr. Hager's Miranda rights, Mr. Hager confessed to killing both Ms. Lacy and Mr. Cisco.[1]

---

1. Mr. Hager and Ms. Lacy had apparently been dating for approximately four to five years prior to Ms. Lacy's death. The evidence at trial indicated a jealous relationship in which Mr. Hager became angry if Ms. Lacy attempted to see other men. Mr. Hager had hit Ms. Lacy and had fired a .357 over her head, as witnessed by Ms. Polly Mae Messer. Mr. Hager had also informed Ms. Lacy's niece, Sherry Waller, that he would kill Ms. Lacy before her would permit her to have a relationship with another man. During a fight in 1993, Mr. Hager allegedly grabbed Ms. Lacy by the hair, pointed a .38 toward her head, and cocked the trigger. Our review of the record reflects that no motive for the Sherman Cisco murder was discovered.

In Mr. Hager's September 26, 1995, confession, he stated that he and Ms. Lacy had argued, that she had begun kicking him and smacking him, that she had thrown a rock at him, and that he shot her. Mr. Hager confessed that after he shot Ms. Lacy, he went home to drink beer. When Mr. Phelps and Mr. Cisco arrived at Mr. Hager's home, Mr. Hager confessed that he gabbed the barrel of Mr. Cisco's shotgun and shot Mr. Cisco.

During the September 26, 1995, interrogation in which Mr. Hager's confession was obtained, the police did not inform Mr. Hager that his family had hired a lawyer, Mr. Bernard Spaulding, to represent Mr. Hager. The police contend that they had no knowledge of the hiring of a lawyer, but Mr. Hager maintained that his family had contacted the officers and informed them that the attorney had been hired. The attorney, Mr. Spaulding, was apparently waiting for Mr. Hager at Williamson, having assumed that the police would transport Mr. Hager there for interrogation. A suppression hearing was held on February 21, 1997, and Mr. Hager maintained that the police were aware that Mr. Spaulding had been hired as an attorney for Mr. Hager. Trooper David Michael Nelson testified at the suppression hearing regarding the confession given by Mr. Hager and Trooper Nelson's lack of knowledge during the interrogation that an attorney had been

hired for Mr. Hager. Deputy Sheriff of Mingo County, Johnny Milum, also testified regarding the confession and the voluntariness of Mr. Hager's statements. Deputy Sheriff Milum also testified that he did not recall any mention of an attorney having been hired for Mr. Hager. Bernard Spaulding also testified that Mr. Hager's sister, Lucille Burton, had contacted him with regard to possibly representing Mr. Hager. Mr. Spaulding testified that he had spoken with a trooper regarding his representation of Mr. Hager, but he could not recall the exact time that call was placed. By order dated May 23, 1997, the lower court denied the motion to suppress, finding that counsel had not been retained for Mr. Hager. The lower court also noted "inconsistencies and discrepancies in the testimony" regarding the alleged hiring of an attorney and found that Mr. Hager did not have legal counsel at the time he signed a written confession and orally confessed. The lower court further found that the confession was voluntary and was "given after Robert Hager knowingly, intelligently, voluntarily and understandably waived his right to counsel...."

On May 22, 1997, the prosecution hand-delivered to defense counsel notice of the State's intention to use West Virginia Rule of Evidence 404(b) other bad acts evidence.[2]

---

2. In a notice dated May 16, 1997, the State noted its intention to introduce the following 404(b) evidence at trial:

> David Wilson—Bo Hager, a lot of times, threatened to beat up Della Jean because she was going out on him.
> David Wilson—Bo Hager whipped Della Jean in his trailer, sometime after Hager moved in his trailer in 1994. They were arguing. Argument usually about her seeing other people.
> William Phelps—Around 1993, Bo Hager put a gun to Della Jean's head. Bo pulled the hammer back on the gun. They were arguing. Bo said something to the effect, "better not f--- with me Della Jean or quit f---ing with me Della Jean."
> Polly Mae Messer—On the day Della Jean was shot, I saw her and Bo Hager at Dorothy's Drive-Inn in the evening. They were arguing. He smacked her and she smacked him back. They kept hitting each other. Bo Hager acted like he was very angry at me also.
> Polly Mae Messer—In July of 1995, I went to Bo Hager's to get Della Jean. When Della Jean came out of the trailer and got in my car,

> Bo Hager came out with a gun, shot it in the air, and said "don't take my woman."

In a notice dated May 22, 1997, the State noted its intention to use other 404(b) evidence, as follows:

> The defendant's killing of Sherman Cisco in his trailer later the same night on which Della Jean Lacy had been killed. This evidence would be provided by the testimony of David Wilson, William Phelps and Sheila Dawn Brewer. This evidence is relevant to the Lacy killing to show the absence of accident, the State of mind of the defendant, intent, premeditation and deliberation, and the complete story.
> The defendant's threats to Sheila Dawn Brewer after the killing of Sherman Cisco. This will be testified to by Sheila Dawn Brewer, David Wilson, and William Phelps. This evidence is relevant to the Lacy killing to complete the story, to prove lack of accident, intent, and malice.
> The defendant threatening David Wilson after the killing of Sherman Cisco at the Della Jean lacy murder scene. This will be testified to by David Wilson and William Phelps. It is rele-

Defense counsel moved to exclude the 404(b) evidence offered by the State, and the lower court took the motion under advisement. Prior to ruling on the defense motions, the lower court noted on the record the requirements of Rule 404(b) enumerated by this Court in *State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994), concerning the proffer of evidence and a determination of what specific evidence the prosecution intends to introduce. The lower court explained that while it did "not intend to conduct a trial within a trial ..." it did wish to hear limited testimony on the 404(b) proffers prior to presentation of such evidence to the jury. After conducting such hearing on May 28, 1997, the lower court informed the parties that the offered evidence would be admitted under Rule 404(b).

In his trial testimony,[3] Mr. Hager recanted his confession regarding the murder of Ms. Lacy and blamed Mr. William Ace Phelps for the Ms. Lacy's murder. Mr. Hager testified that on the day of the murder, he had departed his trailer with Ms. Lacy, intending to take her home. According to Mr. Hager, he and Ms. Lacy picked up acquaintance Mr. Phelps as they drove toward Ms. Lacy's home. Mr. Hager testified that he exited the truck briefly, and as he returned to the truck, he observed Mr. Phelps holding a pistol. Mr. Hager opined that Ms. Lacy apparently flailed at Mr. Phelps, hitting his hand and causing the gun to discharge and kill Ms. Lacy. Mr. Hager and Mr. Phelps allegedly moved Ms. Lacy's body away from the road and drove away. According to Mr. Hager, Mr. Phelps threatened that he would harm Mr. Hager's family if Mr. Hager did not take the blame for the shooting. Mr. Hager went home alone and took "as many as" 10 Valiums, followed by orange juice, vodka, and beer. Later that evening, Mr. Phelps and Mr. Sherman Cisco arrived at Mr. Hager's home. Mr. Hager testified that Mr. Cisco pointed a gun at Mr. Hager and that he therefore grabbed the gun and killed Mr. Cisco in self-defense.

According to Mr. Hager's trial testimony, he, Mr. Phelps, and two other individuals then drove to the location of Ms. Lacy's body. Mr. Hager testified that, in order to pacify Mr. Phelps, Mr. Hager informed the other individuals that he had shot Ms. Lacy. Mr. Hager then proceeded to a friend's home. While Mr. Hager was away from his own trailer, Mr. Hager testified that Mr. Phelps burned the trailer with Mr. Cisco's body still in it.

Mr. Phelps' version of the evening's events is extremely different. He testified at trial that he had received a telephone call from Mr. Hager on the evening of September 23, 1995. Mr. Hager allegedly informed Mr. Phelps that he had "some bad trouble coming down," and Mr. Phelps volunteered to go to Mr. Hager's trailer with Mr. Sherman Cisco. When Mr. Phelps and Mr. Cisco arrived at Mr. Hager's trailer, Mr. Hager allegedly grabbed Mr. Cisco's shotgun and shot him in the fact, exclaiming, "I told you not to f--- with me." After Mr. Hager shot Mr. Cisco, he admitted to Mr. Phelps that he had killed Ms. Lacy earlier that evening. Mr. Phelps also testified that he, Mr. Hager, Sheila Brewer, and David Wilson traveled to the

vant to complete the story, to show the defendant's state of mind, to prove lack of accident, intent, and malice.

In a final notice dated May 22, 1997, the State noted it intention to use the following 404(b) evidence:

Sherry Waller—Last part of summer of 1994 at Ruby and Leo Williams, Bo said, that before I let Della Jean take another man, I'll kill her. Sherry Waller—In 1994 after Della Jean's birthday in October at Bo Hager's trailer, I saw Bo smack Della Jean and grab herby the head of the hair. she started to leave and Bo yelled, "I'll kill you."

3. Trials of the two murders were severed, although the original indictment joined the two murders. Mr. Hager filed a motion to sever the counts, and the lower court granted that motion. The lower court reasoned that information regarding the Cisco murder was not inadmissible in the Lacy murder trial, even though the two murders were to be tried separately. The lower court explained its reasoning during post-trial proceedings by asserting that a joinder of the counts would have precluded Mr. Hager from offering limiting instructions regarding evidence of the two murders. Separating the trials would permit introduction of evidence regarding the other murder, but would protect Mr. Hager to the extent that limiting instructions could be offered. Such limiting instructions were provided, in accordance with *State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994).

location of Ms. Lacy's body that night. Mr. Phelps stated that Mr. Hager forced Ms. Brewer to look at Ms. Lacy's body, saying, "Look, or you'll be laying there with her." Mr. Phelps also indicated that Mr. Hager's trailer was burned by Mr. Wilson and Mr. Hager.

Mr. David Wilson, having visited with Ms. Lacy and Mr. Hager in Mr. Hager's trailer on the day of the murder, testified that he had passed out, and when he awoke, he was alone. Mr. Wilson further testified that Mr. Hager later returned to the trailer with blood on his pants and told Mr. Wilson that he had killed Ms. Lacy because he was "tired of being f---ed with."

The jury found Mr. Hager guilty of murder in the first degree without a recommendation of mercy. Mr. Hager was sentenced to life in prison without the possibility of parole on July 7, 1997.

## II. Rule 404(b)

Mr. Hager contends that the lower court erred in admitting evidence improperly under Rule 404(b). In the alternative, Mr. Hager maintains that the lower court erred in failing to grant the defense motion for a continuance when it decided to admit certain evidence under Rule 404(b) delivered to defense counsel five days prior to trial.[4] Mr. Hager argues that (1) prior domestic violence between Mr. Hager and Ms. Lacy and (2) evidence regarding the murder of Mr. Cisco should not have been admitted.

Rule 404(b) provides as follows:

(b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of

trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

In syllabus point one of *McGinnis*, this Court instructed:

When offering evidence under Rule 404(b) of the West Virginia Rules of Evidence, the prosecution is required to identify the specific purpose for which the evidence is being offered and the jury must be instructed to limit its consideration of the evidence to only that purpose. It is not sufficient for the prosecution or the trial court merely to cite or mention the litany of possible uses listed in Rule 404(b). The specific and precise purpose for which the evidence is offered must clearly be shown from the record and that purpose alone must be told to the jury in the trial court's instruction.

Syllabus point two of *McGinnis* continues:

Where an offer of evidence is made under Rule 404(b) of the West Virginia Rules of Evidence, the trial court, pursuant to Rule 104(a) of the West Virginia Rules of Evidence, is to determine its admissibility. Before admitting the evidence, the trial court should conduct an in camera hearing as stated in *State v. Dolin*, 176 W.Va. 688, 347 S.E.2d 208 (1986). After hearing the evidence and arguments of counsel, the trial court must be satisfied by a preponderance of the evidence that the acts or conduct occurred and that the defendant committed the acts. If the trial court does not find by a preponderance of the evidence that the acts or conduct was committed or that the defendant was the actor, the evidence should be excluded under Rule 404(b). If a sufficient showing has been made, the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence. If the trial

---

4. The Appellant's brief mentions an approach discussed in *U.S. v. Hernandez*, 975 F.2d 1035 (4th Cir.1992), through which some interpretations of Rule 404(b) have excluded evidence of other crimes based exclusively upon the defen-

dant's unequivocal denial of responsibility for those other crimes. 975 F.2d at 1040. As the State's brief correctly notes, the Fourth Circuit referenced that approach for discussion purposes, but did not adopt that precept. *Id.*

court is then satisfied that the Rule 404(b) evidence is admissible, it should instruct the jury on the limited purpose for which such evidence has been admitted. A limiting instruction should be given at the time the evidence is offered, and we recommend that it be repeated in the trial court's general charge to the jury at the conclusion of the evidence.

Subsequent to objections by the defense to the introduction of Rule 404(b) evidence, the lower court held an in camera hearing on the Rule 404(b) issue, as discussed above. The testimony of Sherry Waller, as well as the other individuals offering Rule 404(b) evidence, was presented to the lower court in the in camera hearing, indicating the tumultuous nature of the relationship between Mr. Hager and Ms. Lacy and demonstrating the numerous threats Mr. Hager had made to the life of Ms. Lacy. The lower court evaluated the requirements of *McGinnis* and concluded that Ms. Waller's testimony was admissible under the analysis of *McGinnis*. The lower court conducted that evaluation for every witness offered by the State for Rule 404(b) testimony and concluded that such evidence was admissible under *McGinnis*.

Again on post-trial motions, the lower court found that the jury was provided with a limiting instruction, cautioning it about the limited use of the 404(b) material, and that the basis for admission under the Rule 404(b) was to demonstrate jealousy, to show past threats and acts of violence, and to demonstrate the elements of premeditation, deliberation, and malice. The lower court ruled that "[i]t is clear that the prosecuting attorney has introduced several different reasons as to why this evidence is highly relevant, including lack of accident, motive, and all the elements of murder that it is incumbent upon the State of West Virginia to prove beyond a reasonable doubt." These are, as is required by Rule 404(b), specific rationales, rather than general lists of other crimes.

▇▇ This Court reviews a lower court's determination regarding the introduction of Rule 404(b) other crimes evidence under an abuse of discretion standard. *McGinnis*, 193 W.Va. at 159, 455 S.E.2d at 528. We have emphasized that a circuit court abuses its discretion in admitting Rule 404(b) evidence only where the court acts in an "arbitrary and irrational" manner. *Id.*

▇▇ The lower court was exceedingly meticulous in its analysis of the State's proffer of 404(b) evidence, narrowing its approach to the precise parameters of this Court's instruction in *McGinnis*. This Court explained in *State v. Smith*, 178 W.Va. 104, 358 S.E.2d 188 (1987): "As to the relevancy of other violent acts between a defendant and a deceased, courts have generally permitted such evidence to show ill will or hostility as bearing upon intent, malice and motive for the homicide." 178 W.Va. at 108 n. 2, 358 S.E.2d at 192 n. 2. In *State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613 (1996), addressing a father's conviction for the murder of his infant son, we explained as follows:

> Evidence of the prior attacks and beatings not only demonstrated the motive and set-up of the crime but also was necessary to place the child's death in context and to complete the story of the charged crime. We hold that historical evidence of uncharged prior acts which is inextricably intertwined with the charged crime is admissible over a Rule 403 objection.

196 W.Va. at 313, 470 S.E.2d at 632.

We find no abuse of discretion by the lower court, and we affirm the lower court's decision to permit evidence of the prior tumultuous relationship between Mr. Hager and Ms. Lacy.

▇▇ With regard to the Cisco murder, the lower court again followed the mandates of *McGinnis* by hearing sufficient evidence and arguments of counsel to convince the lower court, by a preponderance of evidence, that the act occurred and that the defendant committed the act. The lower court thereafter specified that the Cisco murder was relevant under Rules 401 and 402 and admissible under the Rule 403 balancing test.[5] The

---

5. Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay,

lower court found that the evidence of Mr. Cisco's murder was appropriate for introduction to provide the jury with an understanding of the return to the body of Ms. Lacy after the killing of Mr. Cisco and to address Mr. Hager's state of mind and lack of accident. The lower court stated:

> To understand the admission that three individuals after the Cisco matter were taken to the scene where the body of Della Jean Lacy lay. I think it is clear that this relates to a material issue. There must be a substantial need for the probative value of the evidence and I think there clearly is based upon what happened related to Della Jean Lacy's murder and evidence after the Cisco murder. It's all part of one complete story.

In our prior excursions through the intricacies of the Rule 404(b) analysis, we have recognized that Rule 404(b) is an inclusive rule through which all relevant evidence of other crimes or acts is admitted unless the sole purpose of the evidence is to demonstrate criminal disposition. *State v. Edward Charles L.*, 183 W.Va. 641, 647, 398 S.E.2d 123, 129 (1990). In *U.S. v. Masters*, 622 F.2d 83 (4th Cir.1980), the Fourth Circuit Court of Appeals explained:

> [O]ne of the accepted bases for the admissibility of evidence of other crimes arises when such evidence, "furnishes part of the context of the crime" or is necessary to a "full presentation" of the case, or is so intimately connected with and explanatory of the crime charged against the defendant and is so much a part of the setting of the case and its "environment" that its proof is appropriate in order "to complete the story of the crime on trial by proving its immediate context...."

622 F.2d at 86 (citing *U.S. v. Smith*, 446 F.2d 200, 204 (4th Cir.1971)). Syllabus point one of *Edward Charles L.*, provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identi-

> waste of time, or needless presentation of cumu-

ty, or absence of mistake or accident. W.Va.R.Evid. 404(b).

> "Based on this reasoning we permit evidence of other crimes in order 'to complete the story' or to show 'the context of the crime.'" *State v. McGhee*, 193 W.Va. 164, 167, 455 S.E.2d 533, 536 (1995).

In his book, Handbook of Evidence for West Virginia Lawyers, Justice Cleckley noted that the complete story principle, "though not mentioned in Rule 404(b), continues to be a viable 'other purpose' for admitting evidence of other wrongs as long as the conduct is truly illustrative of the context of the offense and has independent relevance to a material issue in the lawsuit." Franklin D. Cleckley, Handbook on Evidence for West Virginia Lawyers Sec. 4–5(B)(4)(i), Vol. I at 357 (3d ed. 1994).

In *State v. Spicer*, 162 W.Va. 127, 245 S.E.2d 922 (1978), we noted that evidence of other criminal acts is confined to what is necessary to accomplish its legitimate purpose. Syllabus point one of *Spicer* explains that "[o]ther criminal act evidence admissible as part of the res gestae or same transaction introduced for the purpose of explaining the crime charged must be confined to that which is reasonably necessary to accomplish such purpose."

As the Supreme Court of Virginia noted in *Scott v. Commonwealth*, 228 Va. 519, 323 S.E.2d 572 (1984),

> Where a course of criminal conduct is continuous and interwoven, consisting of a series of related crimes, the perpetrator has no right to have the evidence "sanitized" so as to deny the jury knowledge of all but the immediate crime for which he is on trial. The fact-finder is entitled to all of the relevant and connected facts, including those which followed the commission of the crime on trial, as well as those which preceded it; even though they may show the defendant guilty of other offenses.

323 S.E.2d at 577 (citations omitted.)

Our review of this matter does not indicate any abuse of discretion by the lower court, and we do not find that the lower court acted

> lative evidence."

in an arbitrary or irrational manner. We consequently affirm on this ground.

### III. Admission of Confession

■ Mr. Hager also contends that the lower court erred in admitting his confession. He maintains that the confession should have been suppressed because police failed to inform him that his family had retained counsel. In syllabus point one of *State v. Hickman*, 175 W.Va. 709, 338 S.E.2d 188 (1985), we explained:

A defendant who is being held for custodial interrogation must be advised, in addition to the Miranda rights, that counsel has been retained or appointed to represent him where the law enforcement officials involved have knowledge of the attorney's retention or appointment. This rule is based on the theory that without this information, a defendant cannot be said to have voluntarily and intelligently waived his right to counsel.

In *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), however, the United States Supreme Court affirmed a lower court's determination that a confession was valid, holding that two distinct dimensions exist in a proper waiver of a defendant's constitutional rights. First, the relinquishment of the right to counsel must have been voluntary; second, "the waiver must have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421, 106 S.Ct. 1135. In addressing the issue of whether the police officers' failure to inform the defendant that an attorney had been hired for him invalidated the confession, the Supreme Court stated that the waiver is valid where the decision was uncoerced, the defendant was aware of his right to request a lawyer, and the defendant was aware of the State's intention to use the confession. *Id.* The Supreme Court explained that "events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Id.* at 422, 106 S.Ct. 1135. The police officers' failure to inform the defendant of an attorney's telephone call had no bearing on the validity of the waiver, and the officers' state of mind was determined to be irrelevant to the question of the waiver. *Id.*

The Supreme Court in *Moran* specifically discussed a suggested expansion of *Miranda* to include a requirement that police officers inform a suspect of an attorney's efforts to reach him. Rejecting such augmentation of *Miranda,* the Supreme Court explained that "while such a rule might add marginally to *Miranda's* goal of dispelling the compulsion inherent in custodial interrogation, overriding practical considerations counsel against its adoption." 475 U.S. at 425, 106 S.Ct. 1135. Thus, it is the defendant's state of mind, not the officers' knowledge, that is the dispositive element in determining the voluntariness of a statement.

At a February 21, 1997, suppression hearing, evidence was introduced indicating that Mr. Hager's sister had informed police officers that an attorney had been retained to represent Mr. Hager. As discussed above, the attorney also testified, but the lower court stated in its May 23, 1997, order that it found "inconsistencies and discrepancies" in the testimony of the defense witnesses regarding the contacts with counsel. The lower court concluded that counsel had not "been retained for or on behalf of Robert Hager by members of his family." The lower court further concluded that the confession was voluntarily made and admissible at trial. Mr. Hager has never maintained that the confession was not knowingly and voluntarily made. He simply suggests that the police had knowledge of appointment of counsel and that such knowledge, since not conveyed to Mr. Hager, invalidates that confession.

■ As a two-fold analysis, we are first presented with the lower court's finding that no legal counsel had been retained and that therefore no obligation to inform Mr. Hager existed. We review this factual finding under a clearly erroneous standard. In syllabus point one of *McCormick v. Allstate Insurance Co.,* 197 W.Va. 415, 475 S.E.2d 507 (1996), we stated:

When this Court reviews challenges to the findings and conclusion of the circuit

court, a two-prong deferential standard of review is applied. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard.

With specific regard to findings on a motion to suppress, we explained in *State v. Sugg,* 193 W.Va. 388, 456 S.E.2d 469 (1995), that "this Court will not overturn the factual findings of a trial court on a motion to suppress unless they are clearly erroneous." 193 W.Va. at 399, 456 S.E.2d at 480. In syllabus point three of *State v. Stuart,* 192 W.Va. 428, 452 S.E.2d 886 (1994), we explained:

On appeal, legal conclusions made with regard to suppression determinations are reviewed de novo. Factual determinations upon which these legal conclusions are based are reviewed under the clearly erroneous standard. In addition, factual findings based, at least in part, on determinations of witness credibility are accorded great deference.

Our review of the record compels that conclusion that the lower court, having the opportunity to observe the credibility of the witnesses, was not clearly erroneous in its conclusion regarding the retention of counsel for or on behalf of Mr. Hager. We therefore affirm in this regard.

Secondly, even if we declined to accept that finding by the lower court, the Supreme Court's *Moran* decision would compel an evaluation of whether the police had an obligation to inform Mr. Hager of legal representation if such representation existed and the police had knowledge thereof. Because we resolve this matter through an affirmance of the lower court's factual finding that legal counsel had not been retained, we do not squarely address that hypothetical. We do note, however, the significance of the *Moran* decision and its guidance should such situation arise.

IV. Prosecutor's Cross–Examination

■ Mr. Hager argues that the lower court erred in permitting the prosecutor to question Mr. Hager concerning his failure to disclose his exculpatory explanation, that Mr. Phelps killed Ms. Lacy, prior to trial.

■ Syllabus point one of *State v. Oxier,* 175 W.Va. 760, 338 S.E.2d 360 (1985) provides:

"Under the Due Process Clause of the West Virginia Constitution, Article III, Section 10, and the presumption of innocence embodied therein, and Article III, Section 5, relating to the right against self-incrimination, it is reversible error for the prosecutor to cross-examine a defendant in regard to his pre-trial silence or to comment on the same to the jury." Syllabus Point 1, *State v. Boyd,* 160 W.Va. 234, 233 S.E.2d 710 (1977).

Mr. Hager contends that because a defendant has the right to remain silent, he had no duty to explain the reasons for his initial silence.

The State maintains that the cross-examination of Mr. Hager regarding his recantation of the confession was not a comment on his silence; it was instead a comment on his change of story and his prior inconsistent statement. This is not, the State contends, a utilization of pre-trial "silence." In the United States Supreme Court examination of pre-trial silence in *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the Court found cross-examination regarding pretrial silence impermissible. 426 U.S. at 612–13, 96 S.Ct. 2240. However, in elaborating on that *Doyle* standard in *Anderson v. Charles,* 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980), the Court specified that the *Doyle* standard did "not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." 447 U.S. at 408, 100 S.Ct. 2180.

We conclude that the State's inquiry regarding Mr. Hager's prior inconsistent statements was proper and we affirm on that ground.

V. Prosecutorial Misconduct

■ Mr. Hager also alleges the prosecution attempted to inflame the jury against

Mr. Hager by referencing Mr. Hager's sexual acts with younger women on two specific occasions. First, the prosecutor asked if Mr. Hager had slept with Ms. Sheila Dawn Brewer, a witness for the State. Counsel for Mr. Hager objected, the objection was sustained, and the jury was told to disregard. Second, the prosecutor emphasized Mr. Hager's alleged sexual acts with younger women in the closing statement. Mr. Hager maintains that the prosecutor's references to his sexual activity with younger women was designed to inflame the jury against him.

Defense counsel objected to the prosecutor's question regarding Mr. Hager's sexual activity with Ms. Brewer. The objection was sustained, the jury was told to disregard, and no further curative instructions were requested. This Court has had numerous opportunities to address allegedly prejudicial remarks of prosecutors. While we have recognized that a "prosecuting attorney occupies a quasi-judicial position in the trial of a criminal case[,]" and should "set a tone of fairness and impartiality," [6] we have also sought to achieve a balanced result by emphasizing that not every questionable remark by a prosecutor will result in a reversal of a conviction. In pursuing that goal, we enunciated the following in syllabus point six of *Sugg:*

> Four factors are taken into account in determining whether improper prosecutorial comment is so damaging as to require reversal: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

193 W.Va. at 393, 456 S.E.2d at 474.

Our evaluation of the allegedly improper remarks by the prosecution and the potential effects of those remarks upon the jury, we find that the comments do not warrant reversal.

With regard to the closing arguments statements to which defense counsel did not object, we find that the absence of an objection at trial waives the right to complain on appeal. In *State v. Garrett,* 195 W.Va. 630, 466 S.E.2d 481 (1995), this Court explained that "counsel failed to object . . . to the State's closing argument, thereby failing to preserve the error, if it was error, for appellate review." 195 W.Va. at 643 n. 22, 466 S.E.2d at 497 n. 22. In syllabus point three of *O'Neal v. Peake Operating Co.,* 185 W.Va. 28, 404 S.E.2d 420 (1991), we explained that " '[w]here objections were not shown to have been made in the trial court, and the matters concerned were not jurisdictional in character, such objections will not be considered on appeal.' Syllabus Point 1, *State Road Commission v. Ferguson,* 148 W.Va. 742, 137 S.E.2d 206 (1964)." We consequently find that any objection to the statements made in closing argument were waived.

Based upon the foregoing, we affirm the decision of the lower court in all respects.

Affirmed.

Justice MAYNARD, deeming himself disqualified, did not participate in the decision in this case.

Judge DANIEL O'HANLON sitting by special assignment.

Justice McGRAW did not participate.

---

6. Syllabus point three of *State v. Boyd,* 160 W.Va. 234, 233 S.E.2d 710 (1977), provides as follows:
    The prosecuting attorney occupies a quasi-judicial position in the trial of a criminal case. In keeping with this position, he is required to avoid the role of a partisan, eager to convict, and must deal fairly with the accused as well as the other participants in the trial. It is the prosecutor's duty to set a tone of fairness and impartiality, and while he may and should vigorously pursue the State's case, in so doing he must not abandon the quasi-judicial role with which he is cloaked under the law.