THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. STEVEN M. CRUTCHFIELD, Defendant-Appellant.

Fifth District    No. 5—03—0043

Opinion filed October 19, 2004.

Daniel M. Kirwan and Dan W. Evers, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Charles Garnati, State's Attorney, of Marion (Norbert J. Goetten, Stephen E. Norris, and T. David Purcell, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE HOPKINS delivered the opinion of the court:

Following a jury trial, the defendant, Steven M. Crutchfield, was convicted of first-degree murder (720 ILCS 5/9—1(a)(1) (West 1996)) and sentenced to natural life in the Department of Corrections. On appeal, the defendant argues that (1) he was denied a fair trial because he was required to wear a stun belt during the trial, (2) the circuit court erred in prohibiting him from presenting evidence that supported his defense that he had committed the murder under a sudden and intense passion, (3) the circuit court erred in admitting evidence of "other crimes," and (4) his sentence of natural-life imprisonment should be vacated because it violates the *ex post facto* and double jeopardy clauses of the United States Constitution and the Illinois Constitution (U.S. Const., art. I, § 9, cl. 3; U.S. Const., amends. V, XIV; Ill. Const. 1970, art. I, §§ 10, 16). We affirm.

## FACTS

The defendant's case comes before this court for the second time. At the defendant's first trial for first-degree murder, he was found guilty but mentally ill. In his first appeal, this court reversed and remanded for a new trial because the trial court had erred in refusing

to instruct the jury with the defendant's tendered second-degree-murder instruction. *People v. Crutchfield*, No. 5—00—0004 (2001) (unpublished order under Supreme Court Rule 23 (166 Ill. 2d R. 23)).

On remand, on March 22, 2002, the State filed a "Notice of Intent to Seek Aggravating Factor" pursuant to section 111—3(c—5) of the Code of Criminal Procedure of 1963 (725 ILCS 5/111—3(c—5) (West 2002)). In the notice, the State asserted that it would present evidence to the jury that the murder had been accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. The State also asserted that if the jury found that this aggravating factor had been proved beyond a reasonable doubt, the State intended to seek a sentence of natural-life imprisonment.

On August 28, 2002, before the defendant's second trial began, and out of the presence of the jury, the following colloquy ensued concerning the defendant's wearing a "belt" during the trial:

"MR. BROEKING [defense counsel]: *** I don't remember last time. Did he have the belt on or not?

MR. CURRIE [assistant State's Attorney]: He did.

MR. BROEKING: What's the court's ruling going to be in regard to that? I would ask that he not be shackled and that there—if he's going to be belted, would ask that he wouldn't be, but if he's going to be, we ensure that he is seated at all times when the jury is going to be able to view him.

THE COURT: I think the way we've done it in the past—of course, the sheriff *** runs security, but we're not going to have obviously jail clothes or shackles or manacles in front of the jury. If the sheriff believes a belt is necessary, that's not easily seen, but we would want to make certain that the defendant is in place and seated so that there isn't any opportunity for it to be seen.

Anyone have any objection to that?

MR. BROEKING: No."

A second discussion concerning the belt ensued the following day, again out of the presence of the jury, regarding how the defendant was to enter and exit the room so that the jury would be unaware that he was wearing the belt. The trial judge stated that he had seen the defendant in the hallway and that he did not see the belt. Defense counsel made no other objection concerning the defendant's wearing the belt during the trial. The trial court did not hold a hearing on the issue, and the defendant did not raise the issue in his posttrial motion.

Also before the second trial, the State filed a motion *in limine* seeking to exclude evidence of an X-rated videotape visible on the defendant's ex-wife's entertainment center at the crime scene. The defendant argued that the evidence was admissible because it sup-

ported his defense of provocation. The court granted the State's motion *in limine.*

The evidence adduced at the defendant's second trial was as follows. Tracie Teffertiller testified that the defendant is her ex-husband. Tracie and the defendant were married in May 1998 and divorced in May 1999. During the marriage, Tracie and her daughter, Tori, lived with the defendant at 916 South 14th Street in Herrin, Illinois.

Tracie testified that in October or November 1998, the defendant struck her in the face. The defendant objected to Tracie's testimony and moved for a mistrial. The court sustained the objection, denied the motion for a mistrial, and instructed the jury to disregard Tracie's comments.

Tracie testified that she and Michael Sasso, the victim, had been friends for a couple of months, but on the evening of Friday, March 12, 1999, she began an intimate relationship with him. When Tracie returned home late that evening, the defendant was upset. The defendant accused her of being with another man, beat her with the buckle end of a belt, choked her, and tried to smother her with a pillow. Tracie reported the defendant's abuse on the following Monday and obtained an order of protection.

About 6 a.m. on March 18, 1999, after spending the night with her parents, Tracie returned to her home in Herrin to get dressed for work. Tracie found the defendant unconscious in bed with pill bottles and a suicide note beside him. Tracie called 9-1-1. The defendant was treated at the Veterans Administration Medical Center (VA Hospital) in Marion, Illinois.

After the defendant's attempted suicide, Tracie and the defendant agreed to separate and live apart. Tracie remained in the home on South 14th Street, and the defendant rented an apartment on North 13th Street in Herrin.

On Friday, April 2, 1999, Tracie spent the night at Michael's apartment. The next morning, Tracie and Michael returned to her house. Later that afternoon, Tracie picked up Tori from Tori's father's house. She also rented three movies, none of which were X-rated.

Michael, who was still at Tracie's house, went out with Tracie's sister's boyfriend about 6 or 7 p.m. that evening. Tracie called and had a pizza delivered, and then she and Tori watched a movie before Tori went to bed. About 11:30 p.m., Michael returned, and Tracie locked and chained her front door.

Shortly thereafter, while Tracie and Michael sat on her love seat watching a movie, the defendant broke the front door open and came into the living room. Michael noticed that the defendant had a knife and ran toward the dining room. Tracie tried to call 9-1-1, but her

telephone had no dial tone. When Tracie tried to use her cell phone, the defendant grabbed the phone out of her hand and threw it on the floor. Tracie stood between the defendant and Michael to keep the defendant from attacking Michael, but Tori came out of her bedroom crying. Tracie picked up Tori and told the defendant that he was upsetting her daughter. The defendant said that it did not matter because they were all "going to die tonight." The defendant followed Michael into the dining room.

Tracie testified that Michael and the defendant wrestled on the dining room floor. Michael got away and ran into the living room, but the defendant caught up with and tackled Michael. Tracie heard Michael yell: "Stop it. You're killing me. You're stabbing me." Tracie grabbed the back of the defendant's shirt to pull the defendant off Michael. Michael again got away and ran out the front door. The defendant tried to pull Michael back into the house, but he was unsuccessful. Tracie saw Michael go to a neighboring house.

Tracie tried to get the defendant to calm down and wait for the police, but the defendant left. Tracie saw the defendant run south down the street.

Tracie went to the house of her neighbors, the Woolards, where Michael lay on the ground next to the front steps. Tracie testified that the knife the defendant had used and a Benchtop screwdriver found in her home were not hers. Tracie also testified that, on the evening of the murder, the defendant had worn dark blue jogging pants made of a "slick" material and a black T-shirt.

Tammy Woolard testified that at the time of the murder, she and her husband lived next door to Tracie and the defendant on South 14th Street in Herrin. Between 11:30 and midnight that night, Tammy heard two men yelling. Tammy looked out her bedroom window, which faced Tracie's home, and saw Michael at the bottom of Tracie's porch steps covered in blood. Tammy's husband called 9-1-1.

Tammy's husband went outside to Michael and told Tammy to get towels. When Tammy returned, Tracie and Tori were there. Tammy testified that Tracie was hysterical and screamed: "I can't believe Steve killed Michael. I can't believe he stabbed him. He stabbed him." Tammy called the police and informed them that the defendant had stabbed Michael.

Tammy testified that when the police were shining lights around the area, she saw the defendant's car backed into the driveway at a house across the street and south of Tracie's house. The car was partially blocked from view by trees. Tammy testified that a person sitting in the defendant's car could see the front of Tracie's house.

Warren Blake, a Herrin police officer, testified that when he ar-

rived at Tracie's house shortly before midnight on the evening of the murder, he saw Tammy and Bob Woolard, Tracie, and Michael, who was lying on the ground clutching his stomach in front of the Woolards' house at 912 South 14th Street. An ambulance arrived soon thereafter and took Michael to the hospital.

After talking to Tracie and the Woolards, Blake broadcast a description of the defendant. Blake confirmed that the defendant's car was found at 1005 South 14th Street approximately 30 minutes after he arrived.

Steve Cannon, a Marion police officer, testified that about 4:49 a.m. on the morning after the murder, he saw the defendant walking on the VA Hospital grounds in Marion. He arrested the defendant.

Bruce Graul, a Herrin police officer, testified that about 3:05 p.m. on the day after the murder, he found a knife in the ditch in front of 1104 South 14th Street in Herrin.

John Nagle, a crime scene investigator for the Illinois State Police, testified that he went to Tracie's house at 916 South 14th Street about 4:48 a.m. on the morning after the murder to investigate the murder scene. Nagle found that the screws on the phone box had been loosened with a flathead screwdriver and the wires to the outside phone box were disconnected. Nagle found a black-handled, Benchtop flathead screwdriver on the floor behind the front door. There appeared to be bloodstains on the handle and the blade of the screwdriver. Nagle did not find in Tracie's house the knife connected with the stabbing.

Nagle saw the defendant at the Williamson County sheriff's department about 6 a.m. that morning. Nagle observed that the defendant had scratches on his lower back above his waistline, two scratches on the left side of his neck, a small injury to his left index finger, small scratches on the top of his right hand, and brownish stains on his fingertips. Nagle testified that the defendant was wearing dark blue nylon jogging pants. The cotton liner of the defendant's pants was stained with blood.

Later that afternoon, Nagle went to the 1100 block of South 14th Street in Herrin, where he retrieved a knife from a ditch. The knife was six inches long and had bloodstains on the blade and the wooden handle.

Nagle also went to the defendant's apartment on North 13th Street in Herrin. On the defendant's kitchen table, Nagle found a black-handled, Benchtop Phillips-head screwdriver, the same brand as the flathead screwdriver found at Tracie's house. In a kitchen drawer, Nagle found a set of knives that matched the brand name of the knife found two blocks from Tracie's home.

When Nagle attended Michael's autopsy the following day, he took the knife and the screwdriver with him and asked Dr. Cavanaugh, a forensic pathologist who conducted Michael's autopsy, if Michael's injuries were consistent with these weapons, and Dr. Cavanaugh confirmed that they were.

Stacie Speith, a forensic biologist for the Illinois State Police, testified that she tested the knife and the screwdriver and determined that both items had human blood on them. Speith also tested the bloodstains on the lining of the defendant's jogging pants and determined that the stains were human blood.

Dr. Cavanaugh testified that Michael had 31 stab or puncture wounds, including two stab or puncture wounds to the heart, the right lung, and the left lung; a stab wound that passed through the spleen and the splenic artery, through the pancreas, and into the stomach; and a stab wound to the right renal artery. Dr. Cavanaugh testified that Michael's cause of death was bleeding from a stab wound to the heart, but he noted that several of the other wounds were also potentially lethal injuries.

The defendant did not testify in his own behalf. The defendant's evidence consisted of the testimony of Dr. Lisa McCutcheon, a psychiatrist at the VA Hospital, and Dr. Daniel Holly, a clinical psychologist at the VA Hospital. Both Dr. McCutcheon and Dr. Holly testified concerning their treatment of the defendant at the VA Hospital and as an outpatient following the defendant's suicide attempt on March 18, 1999. Their diagnosis of the defendant was that he was suffering from major depression and a narcissistic personality. Dr. Holly also opined that the defendant was highly intelligent. Both Dr. McCutcheon and Dr. Holly testified that the defendant admitted that he had been charged with domestic battery for hitting his wife.

At the close of the evidence, the jury found the defendant guilty of first-degree murder. On an additional verdict form, the jury also found beyond a reasonable doubt that Michael's murder had been accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. The court entered a judgment on the jury's verdict and, based upon the aggravating factor found by the jury, imposed a sentence of natural-life imprisonment. The defendant filed a timely notice of appeal.

## ANALYSIS

### Stun Belt

The defendant first argues that he was denied a fair trial because he was required to wear a stun belt at his jury trial without the trial court determining that the belt was necessary. The defendant argues

that he was denied his constitutional right to due process and a fair trial because the court was required to conduct a hearing to determine the necessity of his wearing the belt, failed to hold such a hearing, and abdicated its role in deciding the necessity of his wearing the belt.

At the trial, defense counsel made a cursory objection to the defendant's wearing the stun belt, but he failed to raise the issue in his posttrial motion. A failure to object at the trial and raise the issue in a posttrial motion results in a waiver of the issue on appeal. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). However, the defendant claims that this issue should be considered under the plain error doctrine.

Under the plain error doctrine, issues not brought to the attention of the trial court may be considered when either the evidence is closely balanced or the error is so substantial that it affects the fundamental fairness of the proceeding and remedying the error is necessary to preserve the integrity of the judicial process. *People v. Graham*, 206 Ill. 2d 465, 475 (2003). Under a plain error analysis, it is the defendant's burden to show that the error prejudiced him, and a forfeited error cannot be corrected on appeal unless the defendant shows that the error was prejudicial. *People v. Thurow*, 203 Ill. 2d 352, 363 (2003). Even constitutional errors can be waived (see *Thurow*, 203 Ill. 2d at 363-64) if the error is not of such magnitude that it deprives the defendant of a fair trial. See *Graham*, 206 Ill. 2d at 476.

The defendant was convicted of first-degree murder by overwhelming evidence. In fact, on appeal, the defendant does not argue that the evidence was insufficient to prove him guilty beyond a reasonable doubt.

■ The issue of whether the alleged error affects the fundamental fairness of the proceeding is a closer question. The defendant equates his wearing of the stun belt with the wearing of shackles and manacles. In a recent case, *People v. Martinez*, 347 Ill. App. 3d 1001 (2004), the appellate court determined that a due process violation had occurred when a trial court required a defendant to wear a stun belt at the trial and the court had not made findings of necessity and had not considered the factors set out in *People v. Boose*, 66 Ill. 2d 261 (1977) (a court should consider certain factors to determine whether there is a manifest necessity for a defendant to wear shackles at the trial), and instead had deferred to the sheriff's judgment. *Martinez*, 347 Ill. App. 3d at 1004. While we agree with *Martinez* that requiring a defendant to wear a stun belt without conducting a hearing on the necessity for the restraint once he objects is a due process violation, we find that the defendant has not met his burden of showing that the error prejudiced him to the extent that it deprived him of a fair trial, *i.e.*, he did not show that the jury verdict would have been different without

the error. The defendant did not testify at the trial. The stun belt did not hamper the presentation of his defense. In addition, there is no evidence that the jury was even aware that the defendant was wearing the belt. Therefore, because it is clear that the error did not contribute to the defendant's conviction, we find that the plain error doctrine is inapplicable and that the error has been waived.

We note, however, that we do not believe stun belts should be worn as a standard practice, as was done in this case. Had the evidence against the defendant not been so overwhelming, our decision might have been different. The court, and not the sheriff, should control the security of the courtroom.

■ The defendant also claims, alternatively, that his counsel was ineffective for not objecting to his wearing the stun belt. To establish a claim of ineffective assistance of counsel, the two-prong test established in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), must be met. *People v. Enis*, 194 Ill. 2d 361 (2000). The test requires that a defendant prove that his counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Enis*, 194 Ill. 2d at 376. A failure to satisfy either prong of the two-prong test precludes a finding of ineffective assistance of counsel. *Enis*, 194 Ill. 2d at 377.

We have already found that because of the overwhelming evidence against him, the defendant was not prejudiced by being required to wear the stun belt. Because the defendant failed to establish the prejudice prong of the *Strickland* two-prong test, his ineffective assistance claim fails.

### Improper Sentence

■ Finally, the defendant argues that his sentence of natural-life imprisonment violates the *ex post facto* and double jeopardy clauses of the United States Constitution (U.S. Const., art. I, § 9, cl. 3; U.S. Const., amends. V, XIV) and the Illinois Constitution (Ill. Const. 1970, art. I, §§ 10, 16). The defendant argues that the court erred when, pursuant to section 111—3(c—5) of the Code of Criminal Procedure of 1963 (725 ILCS 5/111—3(c—5) (West 2002)), it instructed and submitted to the jury an additional verdict form concerning the aggravating factor of whether the murder had been accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. The defendant claims that the application of section 111—3(c—5) violates the prohibition against *ex post facto* laws because he was convicted of an offense that was not in existence at the time of the murder, first-degree

murder accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. The defendant also claims that, for similar reasons, the application of section 111—3(c—5) constitutes a double jeopardy violation because he was charged with and tried for a greater offense at his retrial. The defendant argues that section 111—3(c—5) is unconstitutional as applied in his case. In essence, the defendant argues that the jury's consideration of the aggravating factor that the murder had been accompanied by brutal or heinous behavior indicative of wanton cruelty added another element to the elements of first-degree murder.

The present version of section 111—3(c—5) of the Code of Criminal Procedure of 1963 (725 ILCS 5/111—3(c—5) (West 2002)), which became effective on February 23, 2001, was enacted in response to the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), wherein the Supreme Court held that whenever a fact is considered that enhances a penalty beyond the statutory maximum, that fact must be considered by a jury and be found to exist beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. Section 111—3(c—5) provides in pertinent part as follows:

> "Notwithstanding any other provision of law, in all cases in which the imposition of the death penalty is not a possibility, if an alleged fact (other than the fact of a prior conviction) is not an element of an offense but is sought to be used to increase the range of penalties for the offense beyond the statutory maximum that could otherwise be imposed for the offense, the alleged fact must be included in the charging instrument or otherwise provided to the defendant through a written notification before trial, submitted to a trier of fact as an aggravating factor, and proved beyond a reasonable doubt." 725 ILCS 5/111—3(c—5) (West 2002).

The question of whether a statute is constitutional is reviewed *de novo. People v. Carney*, 196 Ill. 2d 518, 526 (2001). Similarly, the interpretation of a statute is also reviewed *de novo. People v. Swift*, 202 Ill. 2d 378 (2002).

A law that violates the *ex post facto* prohibition is one that is retrospective, affects substantial rights, and disadvantages the defendant. *People v. O'Quinn*, 339 Ill. App. 3d 347, 362 (2003). A law violates the *ex post facto* prohibition if it is both retroactive and more onerous than the law in effect at the time of the offense, but the *ex post facto* clause does not limit the legislature's control of remedies or modes of procedure, as long as they do not affect matters of substance. *O'Quinn*, 339 Ill. App. 3d at 362. A new decision that modifies the elements of an offense is substantive rather than procedural. *Schriro v. Summerlin*, 542 U.S. 348, 159 L. Ed. 2d 442, 124 S. Ct. 2519 (2004).

"New elements alter the range of conduct the statute punishes, rendering some formerly unlawful conduct lawful or vice versa. [Citation.] But that is not what *Ring* [(*Ring v. Arizona*, 536 U.S. 584, 153 L. Ed. 2d 556, 122 S. Ct. 2428 (2002) (an aggravating factor necessary to impose the death penalty instead of life imprisonment must be considered by a jury and found beyond a reasonable doubt rather than by a judge, in accord with *Apprendi*))] did; the range of conduct punished by death in Arizona was the same before *Ring* as after. *Ring* held that, *because* Arizona's statutory aggravators restricted (as a matter of state law) the class of death-eligible defendants, those aggravators *effectively were* elements for federal constitutional purposes[ ] and so were subject to the procedural requirements the Constitution attaches to trial of elements. [Citation.] This Court's holding[,] that[ ] *because Arizona* has made a certain fact essential to the death penalty, that fact must be found by a jury, is not the same as *this Court's* making a certain fact essential to the death penalty. The former was a procedural holding; the latter would be substantive." (Emphasis in original.) *Schriro*, 542 U.S. at 354, 159 L. Ed. 2d at 450, 124 S. Ct. at 2524.

The rule stated in *Apprendi*, and correspondingly in *Ring*, which is reflected in section 111—3(c—5), is a new procedural rule and not one of substance and, therefore, does not create an element of the offense of first-degree murder. This court held similarly in *O'Quinn* that the requirement of section 111—3(c—5) that a jury consider a sentence-enhancing factor is a mode of procedure. *O'Quinn*, 339 Ill. App. 3d at 362.

In the instant case, the defendant was found guilty of first-degree murder by a jury at his first trial in 1999, prior to *Apprendi*. At sentencing, the trial court, and not the jury, found that the murder had been accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty, and the court imposed a sentence of natural-life imprisonment.

On remand, the State followed the requirements of section 111—3(c—5). At the close of the defendant's retrial, the jury was instructed that if the defendant was found guilty, then it should consider the sentence-enhancing factor, and the jury was given two verdict forms entitled "Additional Verdict Form." The jury found the defendant guilty of first-degree murder and signed the additional verdict form that stated that the evidence had established the aggravating factor beyond a reasonable doubt. At sentencing, based upon the jury's finding at the trial, the court imposed a sentence of natural-life imprisonment. The defendant received the same sentence at his retrial as he received at his first trial. The elements of murder were the same at the defendant's first trial as they were at the retrial. The range of

conduct for murder did not change between the defendant's first trial and his second trial; only the mode of procedure for finding an aggravating factor for an enhanced sentence changed. The procedural change required by the statute did not violate the *ex post facto* provisions of the United States Constitution or the Illinois Constitution.

The defendant also argues that section 111—3(c—5) violates the double jeopardy clauses of the United States Constitution and the Illinois Constitution. His argument rests on the same premise that section 111—3(c—5) violates the *ex post facto* prohibitions of the United States Constitution and the Illinois Constitution—that he was tried on a greater offense at the retrial than he was during his first trial because the aggravating factor that must be proved beyond a reasonable doubt was an added element, *i.e.*, first-degree murder with an aggravating factor.

The double jeopardy clauses of the United States Constitution and the Illinois Constitution provide that a person will not twice be put in jeopardy for the same offense. *People v. Pudlo*, 272 Ill. App. 3d 1002, 1003 (1995). The double jeopardy clause protects against a second prosecution for the same offense after an acquittal, a second prosecution for the same offense after a conviction, and multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717, 23 L. Ed. 2d 656, 664-65, 89 S. Ct. 2072, 2076 (1969); *Pudlo*, 272 Ill. App. 3d at 1003. A well-recognized principle of constitutional jurisprudence is that when a defendant voluntarily seeks to have his original conviction set aside and is successful, it is as though the slate has been wiped clean and the conviction is wholly nullified, and a defendant is not placed in double jeopardy at a retrial. *Pearce*, 395 U.S. at 720-21, 23 L. Ed. 2d at 667, 89 S. Ct. at 2078. However, a defendant cannot be retried on an offense greater than the offense for which he was found guilty at his first trial. *Price v. Georgia*, 398 U.S. 323, 327, 26 L. Ed. 2d 300, 304, 90 S. Ct. 1757, 1760 (1970). Two offenses are the same if they have identical statutory elements or if one offense is a lesser-included offense of the other. *Pudlo*, 272 Ill. App. 3d at 1004.

In *Sattazahn v. Pennsylvania*, 537 U.S. 101, 154 L. Ed. 2d 588, 123 S. Ct. 732 (2003), the Supreme Court determined that the double jeopardy clause of the United States Constitution was not violated where a defendant was tried for first-degree murder and a jury became deadlocked at sentencing regarding whether there was an aggravating factor that allowed for the imposition of the death penalty. In accord with Pennsylvania law, the judge imposed a sentence of natural-life imprisonment because of the jury's deadlock on the death penalty aggravating factor. The defendant successfully appealed, his conviction was reversed, and his case was remanded for a retrial. At the retrial,

the defendant was again found guilty of first-degree murder; this time, the jury unanimously found the existence of the aggravating factor, and the death penalty was imposed. The defendant appealed. The Supreme Court held that the double jeopardy clause was not violated because the jury made no finding concerning the aggravating factor at the first trial, there was no "acquittal" regarding that factor, and the jury was free to consider the aggravating factor and make a finding on it at the retrial. Therefore, the Supreme Court affirmed the imposition of the death penalty at the retrial. *Sattazahn*, 537 U.S. at 112-13, 154 L. Ed. 2d at 599-600, 123 S. Ct. at 740.

In the case *sub judice*, we have already held, in the context of the *ex post facto* issue, that the jury determination of the aggravating factor was not an element of the offense of first-degree murder but was only a new mode of procedure. Thus, the defendant was tried for first-degree murder at his first trial and for the same offense at his retrial. He was not placed in double jeopardy for being tried for the same offense after having had his first conviction set aside at his behest. See *Pearce*, 395 U.S. at 720-21, 23 L. Ed. 2d at 667, 89 S. Ct. at 2078. Because section 111—3(c—5) does not violate the *ex post facto* clause or the double jeopardy clause of the United States Constitution or the Illinois Constitution, section 111—3(c—5) was constitutional as applied to the defendant.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Williamson County is affirmed.

Affirmed.

WELCH and MAAG, JJ., concur.