THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTHONY DuPREE, Defendant-Appellant.

Fifth District No. 5—03—0355

Opinion filed October 28, 2004.—Motion to publish granted November 16, 2004.

Daniel M. Kirwan, of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Michael Wepsiec, State's Attorney, of Murphysboro (Norbert J. Goetten, Stephen E. Norris, and Deirdre A. Hosler, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE HOPKINS delivered the opinion of the court:

Following a jury trial, the defendant, Anthony DuPree, was convicted of burglary (720 ILCS 5/19—1(a) (West 2002)) and theft under $300 (subsequent offense) (720 ILCS 5/16—1(a)(1)(A) (West 2002)). He was sentenced to 10 years' imprisonment for the burglary and 5 years' imprisonment for the theft, with sentences to run concurrently. On appeal, the defendant contends that (1) he was denied a fair trial because he was required to wear a stun belt during the trial, (2) the circuit court erred in sentencing him to an extended term of imprisonment for theft, and (3) he is entitled to additional credit against his sentences for time served in confinement prior to sentencing.

## BACKGROUND

Viewed in the light most favorable to the prosecution (see *People v. Cooper*, 194 Ill. 2d 419, 430-31, 743 N.E.2d 32, 40 (2000)), the evidence presented at the trial of the defendant's guilt was overwhelming.

Testimony at the defendant's March 10 and 11, 2003, trial established that about 11:30 a.m. on March 21, 2002, Kathleen Bailey sat with her employer in a Chevrolet Suburban in the handicapped parking space near the front door of the Office Max store in Carbondale. She noticed a tall, "really skinny" black man standing by the doors of the Office Max. He wore no coat, was shivering from the cold, and was "acting funny," prompting Bailey to continue to watch him carefully. The man, whom Bailey unequivocally identified at the trial as the defendant, walked over to the Suburban and peered into the tinted windows of her vehicle. Bailey observed the defendant's face from a distance of about two feet. He was not wearing eyeglasses. The defendant walked behind the Suburban, continuing to peer into the car, and then walked over to a vehicle that had pulled into the parking lot. The defendant opened the door of the car, put his head into the vehicle, pulled what appeared to be a black handbag from the car, and ran across the highway and then behind an area where some doctors' offices were located. A woman leapt from the vehicle into which the defendant had reached, and she began to scream. When she was shown a photo lineup by the police, Bailey identified the defendant as the person she had seen at the crime scene. She was "98 percent certain" of the correctness of her identification.

Joyce Farag pulled into the parking lot of the Office Max about 11:30 a.m. on March 21, 2002, parked, and noticed a coatless, gloveless, "very tall, very thin man" standing near the building. He was shivering in the cold wind. She was reaching to pick up her purse from the front passenger's seat when the man, whom she identified at

the trial as the defendant, opened the passenger's door of her car. He leaned down into the car and asked her what time it was. His face was 18 inches to two feet from Farag's face. She looked very carefully at his face because she was unsure if she knew him. Farag told him that it was "11:30" and observed that he wore a large, round-faced watch on his wrist that showed the proper time. The defendant closed the door, walked a few steps from the car, returned, jerked the door open, and snatched her purse, saying, "I'll take this." The defendant ran across the street in the direction of the Veach Oil station as Farag leapt from the car and yelled, "That man stole my purse!" She went into the Office Max and cried out that her purse had been stolen, and an employee called the police. When Farag looked at the photo lineup, she picked the defendant's photograph up without hesitation and kept it in front of her on the table as she viewed the other pictures "just to be sure." There was no doubt in her mind at the time of her trial testimony that the defendant was the person who had taken her purse on March 21, 2002.

Lucinda Vinson, a Beck Bus Company driver, was en route to drop off some passengers about 11:30 a.m. on March 21, 2002, when she passed near the doctors' office complex near the Office Max. She saw a man whom she later identified in court as the defendant run from the Office Max area, run across Walnut Street, and pass directly in front of her bus a very short distance from the vehicle. He was running awkwardly as he attempted to push what appeared to be a dark purse with a strap up under his shirt. Vinson looked back toward the Office Max and saw a woman go "running and screaming into the Office Max." She dropped off her passengers, returned the bus to base, and drove her personal vehicle back to the area of the Office Max about 15 minutes after the incident. She saw the defendant, now carrying a jacket and wearing eyeglasses, on the street. Vinson turned her vehicle around in an attempt to see where the defendant was going, but by the time she did so, he was no longer on the street. She assumed that he had entered the apartment complex on Rendleman. Vinson went to the police station and reported what she had seen earlier and upon her return to the area. When she was shown a photo lineup, Vinson pointed to the defendant's photo and told the police that she recognized the defendant as the person involved in the crime.

The defendant came to Stacey Clark's house between noon and 1 p.m. on March 21, 2002. He telephoned his girlfriend and she came to pick him up. The defendant spoke to Clark of the instant crime after that point in time and told Clark that Farag had lied when she said that her purse had been snatched from her presence. He asserted that after he had observed her go into the Office Max without her purse,

he went to her unlocked car, took the purse from the vehicle, and proceeded to Roderick Rowe's house. Once there, he entered the bathroom, took money from the purse, and put the purse in the bathroom wastebasket. He did not want to retain the purse because the police were in the area. Rowe discovered the purse and made the defendant take it out of his house to dispose of it. The defendant was angry with Rowe because he believed that Rowe had called the police and reported him. The defendant asked Clark to tell the police that he was at Clark's house at the time of the crime. About a week after the incident, the police questioned Clark, who could not recall the date on which the defendant came to his house. He later recalled that it was the date that Rachel Johnson had picked him up at Clark's house. Clark admitted that he was upset with the defendant because the defendant had given the police Clark's name, rather than his own, when he was picked up on a traffic offense in Saline County. Clark testified that the defendant sometimes, but not always, wore eyeglasses.

Carbondale police detective Aaron Baril responded on April 3, 2002, to an anonymous telephone tip about the crime. He spoke with Roderick Rowe about the instant crime. He went to Rowe's apartment at Lake Heights, about two blocks south of the Office Max. As a result of his conversation, Detective Baril sought out the defendant. The defendant claimed not to know Rowe and contended that he had been at work at the time of the crime. When the defendant's contention proved false, the defendant then asserted that he had been at Stacey Clark's house. Clark could not substantiate the defendant's assertion until about two weeks before the trial. At that time, Clark told Baril that the defendant had come to his house after the time of the crime and left within the hour with Johnson. When Detective Baril showed Vinson a six-picture photo lineup, she was "80 percent sure" that the defendant's picture matched the person whom she had seen. Farag kept telling Baril that she was fearful of identifying the wrong person. She "actually took [the defendant's] picture" but was unable to choose between the photo of the defendant and a photo of another man. Bailey identified the defendant from the photo lineup as the person whom she saw at Office Max. She told Baril that she was "98 percent certain" of her identification at that time.

Rachel Johnson, who had a dating relationship with the defendant, was called to testify on his behalf. She recalled that she had written a check to pay a traffic ticket for the defendant, that he had picked it up from her at 8 or 9 a.m. on March 21, 2002, and that she had picked him up at Stacey Clark's house about 2:30 p.m. that day. She had no idea what he was doing between those hours. She asserted that at the

time of the crime, the defendant had facial hair, very noticeable tattoos, and prominent scars on his forehead and lip and that he always wore eyeglasses.

The defendant, having indicated in a pretrial motion that he would not testify on his own behalf, did not testify.

The jury returned guilty verdicts on both counts of the information on March 11, 2003, and the trial court ordered the preparation of a presentence investigation report.

The defendant asserted in his March 26, 2003, motion for a new trial that the court had improperly dismissed the only black juror during *voir dire*, despite his challenge to the dismissal, that the court had erroneously denied his motion *in limine* seeking to restrict testimony about what Roderick Rowe might have said, and that the evidence was insufficient to prove him guilty beyond a reasonable doubt. The motion for a new trial was heard on May 1, 2003, prior to the sentencing hearing. At that time, as a basis for a new trial, defense counsel asked the court to consider the fact that the defendant had been required to wear a stun belt during the trial. She stated that she believed that the stun belt "prohibited him from feeling that he was able to fully assist [her] in representing him at trial." She further stated, "In addition, he may or may not have decided on whether or not to take the stand based on the fact that he was wearing a stun belt." The prosecutor commented that this was new information and stated: "I wasn't even aware the defendant was wearing a stun belt. I don't know if any members of the jury were aware the defendant was wearing a stun belt. I don't believe any impact on the jury could possibly be shown." The prosecutor related that defense counsel had told her prior to the trial that the defendant probably was not going to testify. The motion for a new trial was denied by the court, and the case proceeded to sentencing. The defendant was given the opportunity to address the court directly, but he made no allegation that his ability to confer with counsel had been hampered by the stun belt or that his decision not to testify had been the product of wearing the device. The defendant was sentenced to serve 10 years' imprisonment for the burglary and 5 years' imprisonment for the theft, with the sentences to run concurrently. The court stated that the defendant was to be given credit "for all time served." The mittimus, which reflected the certification of the Jackson County sheriff, stated that he was to be given credit against his sentences for 254 days served prior to sentencing. The defendant's May 21, 2003, motion to reconsider sentences, which did not raise any issue relating to the amount of the credit against his sentences to which he was entitled, was denied, and the defendant filed the instant appeal.

## CONTENTIONS ON APPEAL

On appeal, the defendant contends that (1) he was denied a fair trial because he was required to wear a stun belt during the trial, (2) the circuit court erred in sentencing him to an extended term of imprisonment for theft, and (3) he is entitled to additional credit against his sentences for time served in confinement prior to sentencing.

## DISCUSSION

### I. Stun Belt

■ The defendant argues that he was denied a fair trial and denied his constitutional right to due process because he was required to wear a stun belt during his jury trial and that the trial court should have conducted a hearing to determine whether it was necessary for him to do so.

The only indication in the trial record that the defendant was outfitted with a stun belt during his trial is in the transcript of the hearing on his motion for a new trial. Defense counsel told the court that she did not object to the stun belt during the trial because she was unaware that there was some case law to the effect that the trial court was supposed to address the use of stun belts on a case-by-case basis. She told the court, "I believe that the necessity of wearing a stun belt prohibited [the defendant] from feeling that he was able to fully assist me in representing him at trial." Defense counsel did not tell the court when she became aware that the defendant was wearing a stun belt. She failed to detail what led her to believe that the defendant felt that he was not fully able to assist her or in what manner he might have contributed to his defense had he "felt fully able" to do so. Defense counsel stated, "[The defendant] *may or may not* have decided on whether or not to take the stand based on the fact that he was wearing a stun belt." (Emphasis added.) She did not overtly state that he did, in fact, forego testifying on his own behalf because of the belt, and the pretrial motion indicating that he would not testify is devoid of any allegation that his decision not to testify was prompted by the stun belt.

The prosecutor was totally unaware that the defendant was wearing a stun belt and did not know if the jurors were cognizant of the alleged fact, but she believed that it was not possible to show that the jury was impacted in any way by the stun belt. It is fair and logical to assume from the prosecutor's statement that the stun belt was not visible to the onlookers.

Although the defendant had the freedom to address the court, he did so without asserting that he had actually worn a stun belt during

the trial, that he had been inhibited in his interaction with counsel because of the belt, or that he had decided not to testify because he was wearing the belt. The record substantiates that defense counsel filed a written motion prior to the trial in which she stated, "[T]he defendant has indicated to counsel that he will not testify in his jury trial."

Although at the hearing on his posttrial motion the defendant orally raised the issue of the lack of a hearing on the use of the stun belt, he failed to make a contemporaneous objection at the trial, thereby procedurally defaulting the issue on appeal. See *People v. Crutchfield*, 353 Ill. App. 3d 1014, 1021 (2004). He asserts that this court should consider the issue under the doctrine of plain error.

In *People v. Evans*, 209 Ill. 2d 194, 808 N.E.2d 939 (2004), the Illinois Supreme Court observed: "Courts of review may consider a waived error under the plain error doctrine in two circumstances[:] where the evidence is closely balanced and where the error is of such magnitude that it denied the accused of a fair and impartial trial. [Citations.] The accused is denied a fair and impartial trial where the prejudice reveals a total breakdown in the integrity of the judicial process." *Evans*, 209 Ill. 2d at 224, 808 N.E.2d at 956. The defendant assumes the burden of demonstrating that he was prejudiced by an alleged error; a reversal on appeal is not warranted unless the error is proven to have been prejudicial, and even the right to raise constitutional errors may be defaulted if the errors are insufficient to show that the defendant was deprived of a fair trial. *People v. Thurow*, 203 Ill. 2d 352, 363-64, 786 N.E.2d 1019, 1025-26 (2003); *Crutchfield*, 353 Ill. App. 3d at 1021. Given the quality and quantity of the evidence against him, it is not surprising that the defendant fails to argue that the evidence was closely balanced.

The defendant does contend, however, that his trial was rendered fundamentally unfair by the fact that he was required to wear a stun belt without the court having first determined that it was necessary for him to do so. He cites *People v. Martinez*, 347 Ill. App. 3d 1001, 808 N.E.2d 1089 (2004), in support of his position. In *Martinez*, the defendant objected to the stun belt prior to the trial, and the trial court failed to analyze the factors that should be used to determine the necessity for extraordinary restraints at the trial prior to simply deferring to the sheriff's judgment and trying the defendant while he was wearing a stun belt. The reviewing court found that the trial court's failure to consider on the record the criteria for restraining defendants after the defendant objected to the use of the stun belt constituted a due process violation that deprived him of a fair trial. *Martinez*, 347 Ill. App. 3d at 1004, 808 N.E.2d at 1092.

The use of obvious restraints and other indicia of incarceration at the trial does have the potential to prejudice a jury. We noted in *Crutchfield* that we agreed with *Martinez* that it is a due process violation if the trial court fails to conduct a hearing on the necessity for the device once the defendant has objected to the use of a stun belt. *Crutchfield*, 353 Ill. App. 3d at 1021. This position is in alignment with the United States Supreme Court's position on the indicia of incarceration at a trial:

"[A]lthough the State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes, the *failure to make an objection* to the court as to being tried in such clothes, for whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation." (Emphasis added.) *Estelle v. Williams*, 425 U.S. 501, 512-13, 48 L. Ed. 2d 126, 135, 96 S. Ct. 1691, 1697 (1976).

Here, unlike *Martinez*, there was no contemporaneous objection to the requirement that the defendant wear a stun belt during the trial. We note that the defendant's decision not to take the witness stand was made prior to the trial and was included in a motion *in limine*. There was no indication in the record that his decision not to testify was prompted by the fact that he would wear a stun belt during the trial. The defendant was present when his counsel speculated that his decision to forego testifying was possibly attributable to the stun belt and that the belt might have caused him to not feel "fully able" to assist in his own defense. When he addressed the court, he did not even mention the belt, much less assert that it had hampered him in assisting counsel or that he had chosen not to testify because he was wearing the device.

There is not a scintilla of evidence that the jury could have been aware of the stun belt. It came as a surprise to the State that the defendant had been wearing a stun belt, and defense counsel herself may arguably have been unaware of the stun belt until she received a memo from the Office of the State Appellate Defender in which the *Martinez* case was discussed and she queried the defendant. The trial court's failure to conduct a hearing on the necessity of the stun belt as a restraint for the defendant did not contribute to his conviction, and thus the plain error doctrine is inapplicable and the error has been procedurally defaulted.

We do, however, note that the use of stun belts on the order of the sheriff, without any vetting of the procedure by the court, should not be standard operating procedure. Our decision might have differed had the evidence against the defendant not been so overwhelming. See *Crutchfield*, 353 Ill. App. 3d at 1022.

The defendant also asserts in the alternative that his counsel provided inadequate assistance because she failed to object to the use of the stun belt prior to or at the trial. Claims of ineffective assistance of counsel are reviewed under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). Under *Strickland*, a defendant must prove both that (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defense in that, absent counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687, 694, 80 L. Ed. 2d at 693, 698, 104 S. Ct. at 2064, 2068. The failure to prove both prongs of the test will result in a finding that counsel provided adequate assistance. *Evans*, 209 Ill. 2d at 220, 808 N.E.2d at 954.

The overwhelming evidence against the defendant caused this court to find that he was not prejudiced by being required to wear a stun belt, precluding us from finding that the defendant established the prejudice prong of the *Strickland* two-prong test. His claim of ineffective assistance of counsel must therefore fail.

## II. Extended Term for Theft Conviction

■ The State concedes, and this court agrees, that the defendant could receive an extended term in prison only "for the class of the most serious offense of which the offender was convicted." 730 ILCS 5/5—8—2(a) (West 2002); *People v. Pinkonsly*, 207 Ill. 2d 555, 568, 802 N.E.2d 236, 245 (2003). The imposition of an extended term of imprisonment on both of the defendant's convictions was impermissible. His sentence for theft is therefore reduced to the maximum statutory period of three years' imprisonment for a Class 4 felony. See 730 ILCS 5/5—8—1(a)(7) (West 2002).

## III. Credit for Pretrial Incarceration

Initially, we note that sentencing credit for time served is a right afforded by statute and that, thus, a defendant's failure to present the issue to a trial court, either by contemporaneous objection or by post-sentencing motion, does not result in the procedural default of this issue. *People v. Bailey*, 235 Ill. App. 3d 1, 5, 600 N.E.2d 1267, 1269 (1992).

The defendant's opening brief contends that he is entitled to 371 days' credit against his sentences for burglary and theft for time spent in custody from April 26, 2002, until May 1, 2003, the date on which he was sentenced, as opposed to the 254 days listed in the mittimus. The State argues that the defendant is entitled to credit only for the time spent in custody between his April 26, 2002, arrest and the date

on which he posted bond, July 18, 2002, and the time spent in the Jackson County jail between November 14, 2002, when he was served with the August 12, 2002, arrest warrant, and May 1, 2003, when he was sentenced. It calculates the number of days' credit to which he is entitled as 253, one less than the mittimus stated.

In his reply brief, the defendant concedes that he posted bond in the instant case on July 18, 2002, and that he is not entitled to credit against his sentences for the days between that date and August 12, 2002, when the trial court increased the amount of his bond and issued a warrant for his arrest. He asserts, however, that he is still entitled to more days of credit against his sentences than he was given, a total of 347 days. The defendant argues that under *People v. Robinson*, 172 Ill. 2d 452, 667 N.E.2d 1305 (1996), he is entitled to credit against his sentences in the instant case for time spent in custody between August 12, 2002, when he was in the Saline County jail, and November 14, 2002, when he was returned to the Jackson County jail from Big Muddy River Correctional Center (Big Muddy). He contends that his bond was "effectively revoked" and that he was "effectively placed back in custody in this case by the trial court increasing his bond on August 12, 2002," notwithstanding the fact that the trial court never revoked his bond and the defendant never formally moved to withdraw his bond or surrendered the bond money that he had posted on July 18, 2002. The defendant asserts that it was not his responsibility to arrange to have the warrant for the failure to appear served, that the prosecutor was aware on the date that the warrant was issued that he was in custody in Saline County, and that under section 107—9(f) of the Code of Criminal Procedure of 1963 (725 ILCS 5/107—9(f) (West 2002)), the warrant could have been faxed to that county's jail on the day that it was issued, in conformance with section 107—16 of the Code of Criminal Procedure of 1963 (725 ILCS 5/107—16 (West 2002)), which imposes a duty on law enforcement officers to serve warrants "without delay."

The record on appeal substantiates that the defendant was on mandatory supervised release from the Department of Corrections on "home monitoring" when he was served with a summons on April 25, 2002, and docket sheet notes indicate that he appeared in court "from jail" on the burglary and theft charges in the instant case on April 26, 2002. He was indisputably in custody on the charges as of April 26, 2002. On May 16, 2002, he was returned to Menard Correctional Center (Menard) for violating the terms of his mandatory supervised release in Jackson County case No. 99—CF—467. On June 12, 2002, he was transferred from Menard to Big Muddy. The defendant appeared in Jackson County court on June 27, 2002, and the judge set

the instant case for an August 12, 2002, trial. The defendant posted 10% bond on the $5,000 bond on July 18, 2002, while he was in custody at Big Muddy. He was also given notice of his August 12, 2002, court date at that time. The next day, July 19, 2002, the defendant was released from Big Muddy.

When the defendant failed to appear for the trial on Monday, August 12, 2002, defense counsel informed the court that a friend of the defendant had called her office that morning and had told her that the defendant was being held under the name of Stacey Clark in the Saline County jail on charges of obstruction of justice and driving with a suspended license that stemmed from an August 7, 2002, incident. Counsel stated that "all this came about on Friday," which would have been August 9, 2002. She sought a stay of warrant or a continuance of the trial. The State announced ready for trial and objected to the continuance. It asked for a warrant to issue with a "substantial bond" for the defendant for his failure to be present in court, in order to have a detainer on the defendant to bring him to Jackson County when he was released, if in fact he was being held in custody somewhere. The trial court stated that a warrant would issue for the defendant for his failure to appear, and it set bond at $10,000. A written warrant issued for the defendant on August 12, 2002, "to answer a charge made against [him] for the offense of THEFT CON INTENT $300 PRIOR [sic]" and to "hold [him] for bail." There is no support in the record for the conclusion that the Saline County authorities had any knowledge that a warrant had issued for the defendant or that his bond had been increased.

Department of Corrections (Department) records, of which we may take judicial notice (see *People v. Williams*, 328 Ill. App. 3d 879, 887, 767 N.E.2d 511, 519 (2002)), show that August 7, 2002, is the defendant's custody date for the Saline County obstruction-of-justice charge, to which he pleaded guilty on September 5, 2002. The presentence investigation report substantiates that he committed the crime on August 7, 2002, and that on September 5, 2002, he pleaded guilty to the Saline County charge. The Saline County court issued the judgment and sentence order on September 9, 2002. Department records also show that he returned to the actual custody of the Department at Menard on September 13, 2002, following his conviction in Saline County. He was transferred to Big Muddy on October 16, 2002. The records show that on November 14, 2002, he was "paroled out" of Big Muddy. Department records give August 17, 2002, as the custody date for his convictions in the instant case.

On November 14, 2002, the defendant was transported by the Jackson County sheriff's department from Big Muddy to the Jackson

County jail on a "prison extradition." He was served with the outstanding warrant when he arrived at the Jackson County jail on that date. On December 2, 2002, defense counsel moved to reduce his bond, which the motion claimed was "excessive in light of his inability to attend his court date." The motion described the defendant as having "been in custody since his arrest on November 14, 2002." On January 16, 2003, counsel moved to have the motion docketed for a hearing. The record does not reflect that the defendant's motion to reduce his bond was ever heard prior to the commencement of the trial on March 10, 2003. He remained in custody in the Jackson County jail until his May 1, 2003, sentencing hearing.

In *People v. Arnhold*, 115 Ill. 2d 379, 504 N.E.2d 100 (1987), the Illinois Supreme Court stated: "[A] defendant who is out on bond on one charge, and who is subsequently rearrested and returned to custody on another charge, is not returned to custody on the first charge until his bond is withdrawn or revoked." *Arnhold*, 115 Ill. 2d at 383, 504 N.E.2d at 101. This court held in *People v. Hatchett*, 203 Ill. App. 3d 989, 560 N.E.2d 1347 (1990), that it was improper for the trial court to refuse to grant a defendant's *pro se* "Motion to Recover Bond Money," which it interpreted as a motion to withdraw his bond, filed after the defendant had been arrested on unrelated charges. The defendant in the instant case never filed a motion to withdraw or exonerate the bond that he had posted on July 18, 2002, nor did the trial court expressly revoke his bond when he failed to appear on August 12, 2002, for trial on the instant charges. His motion for the reduction of bond asserted that he had "been in custody since his arrest on November 14, 2002."

The defendant considered himself to again be "in custody" on the instant charges as of his November 14, 2002, arrest on the August 12, 2002, warrant. So does this court. There is no dispute between the parties over giving the defendant credit against his sentences for the days he spent in custody on the instant charges between his arrest on April 26, 2002, and July 18, 2002, when he posted bond, a period of 84 days. There is also no dispute between the parties that he is entitled to credit against his sentences in the instant case for time spent in custody between November 14, 2002, when he was served with the warrant issued on August 12, 2002, and his May 1, 2003, sentencing date, a total of 169 days. Between the two periods of incarceration, the defendant was undeniably entitled to a credit of 253 days.

The question is, then, whether the trial court's grant of the State's motion to increase his bond on the burglary and theft charges was tantamount to a revocation of his bond.

■ We cannot find that to be the case. However, the unique facts

of the instant case militate in favor of finding that the defendant is entitled to credit for his incarceration between August 12, 2002, and November 14, 2002. Defense counsel was aware that the defendant was in custody in Saline County on the date that the court increased his bond and that the warrant issued for his arrest for the underlying theft charge, not for a failure to appear. We assume that defense counsel was cognizant of the supreme court's holding in *Arnhold*. It behooved defense counsel to move to withdraw the bond posted in the instant case in order to allow the defendant to earn credit against his eventual sentences in the instant case at the same time that he earned credit against his sentence in the Saline County case. Counsel's failure to do so prompts this court to remand the case to the circuit court of Jackson County to amend the mittimus to reflect a credit against the defendant's sentences for a total of 347 days' presentence incarceration.

## CONCLUSION

For the foregoing reasons, the defendant's conviction is affirmed, his sentence for theft is modified to the maximum statutory period of three years' imprisonment for a Class 4 felony, and the cause is remanded to the circuit court to amend the mittimus to reflect that the defendant is entitled to 347 days' sentencing credit for presentence incarceration.

Affirmed as modified; cause remanded with directions.

CHAPMAN, P.J., and WELCH, J., concur.