424 S.E.2d 248

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Elizabeth HOLLIDAY, Defendant Below, Appellant.**

No. 20929.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 16, 1992.

Decided Nov. 12, 1992.

Teresa A. Tarr, Sr. Asst. Atty. Gen., Charleston, for appellee.

C. Cooper Fulton, Kanawha County Public Defender Corp., Charleston, for appellant.

PER CURIAM:

The defendant in this proceeding, Elizabeth Holliday, was arrested and charged with two counts of aggravated robbery. She was tried by a jury and convicted on both counts. On February 15, 1991, the Circuit Court of Raleigh County sentenced her to concurrent sentences of twenty years and fifteen years in the State penitentiary on the convictions. In the present appeal, the defendant claims that the trial court erred by forcing her to appear in shackles during her trial and in failing to provide her an evidentiary hearing on the question of whether such shackles were necessary. After reviewing the record filed and the questions presented, this Court agrees that the trial court failed to conduct an adequate evidentiary hearing on the necessity of trying the defendant in shackles and remands this case for such a hearing.

The defendant was charged with the separate aggravated robberies of two retired

men, Dallas Lilly, a retired janitor who lived in Raleigh County, and Oscar Lucas, another sixty-five-year-old retired man who also lived in Raleigh County. Evidence adduced by the State during the defendant's trial showed that during the night of December 2–3, 1989, the defendant entered the trailer of Dallas Lilly while he was asleep. Mr. Lilly woke up and recognized the defendant, although he did not know her name. He asked her what she was doing, and she asked him if he wanted a date and started to take off her clothes. He indicated that he did not want a date and told her to leave him alone. He got up and attempted to move away. Instead of letting him move away, according to the State's evidence, the defendant started frisking him, shoved him down, and took his billfold. She then left his trailer, ran across a field, and got into a waiting car. After the defendant had left, Mr. Lilly noticed that, in addition to his billfold, his watch was also gone.

On the following day, Mr. Lilly went to a local bar and grill and ascertained that the defendant's name was Elizabeth "Sissy" Holliday.

The defendant was subsequently arrested for the robbery of Mr. Lilly, and during an inventory search performed during the arrest a watch was discovered which Mr. Lilly subsequently identified as his watch which had disappeared from his trailer.

During her trial, the defendant introduced alibi evidence which indicated that she was not at Mr. Lilly's trailer at the time of the crime charged and that she could not have committed the crime.

Evidence adduced by the State relating to the second aggravated robbery charge showed that between 4:00 and 4:30 a.m. on December 3, 1989, the defendant and one Henrietta Miller went to the home of Oscar Lucas. Mr. Lucas let them in because the two women were acquainted with his son and had been in the house before. According to the State's evidence, while Henrietta Miller went into the kitchen to get some coffee, the defendant sat down with Mr. Lucas and asked to borrow $2.00 to buy some gas. Mr. Lucas gave her the change

that he had in his pocket and told her that that was all the money he had. She then asked him to take his billfold out and open it up. According to the State's evidence, when he refused the defendant knocked him down on the couch and stood on his left hand. A moment later, Henrietta Miller, who had apparently entered the room, and who was standing beside the coffee table, held his right hand down. The defendant then hit him above the eye with an object and reached into his pocket and took his wallet.

The defendant was also arrested for aggravated robbery for this incident, and an inventory search performed at the time of the arrest produced two telephone credit cards in the name of Oscar Lucas.

During trial the defendant admitted that while she was at Mr. Lucas' home at the time of the crime charged, contrary to his story, she was involved in an altercation with him. She indicated that she was very angry, that she didn't know what she was doing, and that she, in effect, did not rob him.

Prior to the commencement of the defendant's trial, a question arose as to whether the defendant, who had apparently been involved in a violent altercation in jail, should be shackled during trial. The State took the position that it was indifferent as to the use of shackles and would defer to the bailiff's judgment as to whether he could handle any potential problems. The trial judge, to resolve the question, conducted a "hearing." At the "hearing" no witnesses were called and the sole evidentiary development consisted of discussion between the judge, the attorneys, and the court bailiff. During the discussion, the following colloquy occurred between the court and the court bailiff:

THE COURT: Mr. Vest, as the person in charge, as bailiff in charge of security within the courtroom, what, what feelings do you have as to your abilities to maintain security in the absence of restraints of the defendant?

THE BAILIFF: All I know is what they have told me at the jail. There was, I think last Wednesday, they had an inci-

dent that took about three of them to get her settled down involving Ms. Holliday.

The court, following this colloquy, ordered that the defendant wear leg irons during trial, except when she was testifying. The court noted that for the most part the restraints would not be visible to the jury because the restraints could not be seen when the defendant was seated at counsel table. The court also provided that prior to the defendant's testimony, the shackles were to be removed out of the jury's presence and that when the defendant's presence was necessary during bench conference, the jury could be dismissed.

After ruling that the defendant was to be tried in shackles, a jury was impanelled and trial was conducted. During trial the fact that the defendant was in shackles was rather clearly brought to the jury's attention.

In the present proceeding, the defendant claims that the trial court erred in requiring her to appear for trial in shackles and that the trial court also erred in failing to conduct a true evidentiary hearing on the question of whether shackles were necessary.

■ In *State v. Brewster*, 164 W.Va. 173, 261 S.E.2d 77 (1979), this Court discussed the use of physical restraints on a criminal defendant during that criminal defendant's trial. The Court noted that there was authority supporting the position that a criminal defendant had the right, absent some necessity relating to courtroom security or order, to be tried free of physical restraints. The Court concluded that that principle was the law in West Virginia. In syllabus point 3 of *Brewster*, the Court summarized the conclusion as follows:

A criminal defendant has the right, absent some necessity relating to courtroom security or order, to be tried free of physical restraints.

The Court proceeded to note that there were a number of factors which could justify the use of physical restraints, and in discussing these factors, the Court cited with approval the list of determinative factors discussed in "The A.B.A. Advisory Committee on the Criminal Trial, *Standards Relating to Trial by Jury* (Approved Draft 1968) at 96 n. 9." Those factors were: (1) The seriousness of the present charge, (2) the person's character, (3) the person's past record, (4) past escapes by the person, (5) attempted escapes by the person, (6) evidence the person is planning an escape, (7) threats of harm to others, (8) threats to cause disturbance, (9) evidence the person is bent upon self-destruction, (10) risk of mob violence, (11) risk of attempted revenge by victim's family, (12) other offenders still at large.

In the later case of *State v. Peacher*, 167 W.Va. 540, 280 S.E.2d 559 (1981), the Court indicated that the factors set out by the ABA Advisory Committee were relevant considerations in determining whether a defendant should be tried while under physical restraint.

In *State v. Brewster, supra*, the Court noted that no adequate record had been made relating to the use of restraints in Brewster's case and ruled that it could not be presumed from a silent record that the use of restraints was appropriate. The Court stated:

We do not believe, however, that the failure to develop a record of the necessity for physical restraints requires an automatic reversal of the defendant's conviction. The issue to be resolved is whether sufficient reasons for the use of the handcuffs existed. If a manifest necessity existed for their use, this would outweigh, from a policy standpoint, their prejudicial effect.

*State v. Brewster, supra* at 182, 261 S.E.2d at 82.

The Court noted that where the question of whether physical restraints should be used had arisen in other courts, the matter was disposed of by remanding the matter for a hearing to determine whether restraints were necessary, and not resolved by automatically reversing the defendant's conviction and granting the defendant a new trial. The Court concluded that such disposition was appropriate in West Virginia. The Court, therefore, remanded Brew-

ster's case to the circuit court with directions to the circuit court that it conduct an evidentiary hearing to determine if there were sufficient facts to warrant trying the defendant in restraints. The Court further stated that if, under the standards set forth in the *Brewster* opinion, the circuit court found that the defendant should have been so tried, the conviction should be reentered. If, on the other hand, the court found that the evidence was insufficient to support trial in restraints, a new trial should be accorded to the defendant.

In the case presently before the Court, after examining the record it is clear that the trial court did not conduct a full evidentiary hearing on the question of whether the defendant should be tried in shackles. Although the bailiff communicated hearsay information indicating that the defendant had been involved in an altercation in the jail, it is clear from an examination of the record that the trial court did not take sworn evidence about this altercation or about the other factors set out in the ABA standards cited above. Although the evidence at the subsequent trial of the defendant suggested that she had been involved in crimes of violence and also suggested that she had a past record involving some violence, the Court does not believe that the evidence was fully and meaningfully developed in the context of the necessity of trying the defendant in shackles.

In line with the thinking discussed in *State v. Brewster, supra,* the Court does not believe that the failure of the trial court to conduct a full evidentiary hearing necessarily requires that the defendant be granted a new trial. The Court, however, believes that the case should be disposed of as the *Brewster* case was disposed of.

The Court, therefore, remands this case to the Circuit Court of Raleigh County with directions that the circuit court hold an evidentiary hearing to determine if there were sufficient facts to warrant the trying of the defendant in shackles. If, under the standards discussed in *State v. Brewster* and *State v. Peacher, supra,* the circuit court finds that the defendant should have been so tried, the conviction of the defendant shall be re-entered. If the circuit court finds that the evidence is insufficient to warrant the trial of the defendant in shackles, a new trial should be afforded to the defendant.[1]

Remanded with directions.

---

1. In reaching the decision in this case, the Court is mindful of its different ruling in the factually similar case of *State v. Rood,* 422 S.E.2d 516 (W.Va.1992). In *Rood,* the Court concluded that there was overwhelming evidence of Mr. Rood's guilt and that under the circumstance the fact that Mr. Rood appeared in prison attire could not have adversely affected the jury in its deliberations. The Court believes that the case presently under consideration is factually different from the *Rood* case since the evidence relating to the defendant's involvement in the crimes charged was contradictory and since the credibility of witnesses, and, in particular, the credibility of the defendant herself, was critical to the jury's verdict.