618 S.E.2d 544

**STATE of West Virginia, Plaintiff Below, Appellee**

v.

**Denver A. YOUNGBLOOD, Jr., Defendant Below, Appellant.**

No. 31765.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 18, 2005.

Decided June 24, 2005.

Dissenting Opinion of Justice Davis July 8, 2005.

Dissenting Opinion of Justice Starcher July 12, 2005.

Robert C. Stone, Jr., Esq., Martinsburg, West Virginia, Attorney for the Appellant.

Debra M.H. McLaughlin, Esq., Morgan County Prosecuting Attorney, Berkeley Springs, West Virginia, Attorney for the Appellee.

PER CURIAM:

This case is before this Court upon the appeal of Denver A. Youngblood, Jr. from his convictions in the Circuit Court of Morgan County, West Virginia, by a jury, of two counts of sexual assault, two counts of brandishing a firearm, one count of wanton endangerment involving a firearm and one count of indecent exposure. The convictions arose from the allegations of the State that Young-

blood, in July 2000, abducted three young women and twice sexually assaulted one of them. Pursuant to the final order of the Circuit Court entered on October 3, 2003, Youngblood was directed to serve penitentiary and jail terms for a combined sentence of not less than 26 years and 90 days nor more than 60 years and 90 days. According to the Docketing Statement filed with this Court, Youngblood is currently incarcerated in the Eastern Regional Jail in Martinsburg, West Virginia.

This Court has before it the petition for appeal, all matters of record and the briefs and argument of counsel. Although appellant Youngblood brings into consideration a number of assignments of error in challenging his convictions, this Court concludes, for the reasons stated below, that those assignments are without merit. Accordingly, the final order of the Circuit Court entered on October 3, 2003, is affirmed.

I.

Factual Background

On July 27, 2000, Katara N. and Kimberly K. went to a birthday party for their friend, Wendy S. who had just turned 18.[1] The party was held at the Motel 6 in Hagerstown, Maryland. The next day, Katara, Kimberly and Wendy walked to a store to get some food and met two strangers, appellant Youngblood, age 28, and Joseph Pitner, age 22. In need of a ride to their homes in Martinsburg, West Virginia, the three women got into Youngblood's vehicle, and the five individuals left the Hagerstown area.

Instead of going to Martinsburg, however, Youngblood drove the vehicle to his residence near Berkeley Springs, West Virginia. According to the State, while the individuals were in the residence, Youngblood ordered Katara N. into his bedroom where he placed a revolver against her head and made her perform oral sex on him. At some point during that incident, Kimberly and Wendy knocked on the bedroom door and told

1. On July 27, 2000, Katara N. was 16 years old, Kimberly K. was 15 years old and Wendy S. had just turned 18. In this sensitive matter, this Court will follow its past practice and shall refer to the last names of the three women by initials only. *In the Matter of Jonathan P.*, 182 W.Va. 302, 303 n. 1, 387 S.E.2d 537, 538 n. 1 (1989).

Youngblood that Pitner was leaving in the vehicle. Youngblood became enraged, left the bedroom with the revolver [2] and pointed it at Pitner who was beginning to drive away.[3] Soon after, Youngblood and Pitner, without explanation, drove away together leaving Katara, Kimberly and Wendy alone at the Youngblood residence. The three women immediately went to a neighboring house, made a 911 call to the police and returned to the Youngblood residence. During the 911 call, placed by Wendy S., no mention was made of a sexual assault. Instead, the police were told that the women were at an unknown location and needed a ride home.

Appellant Youngblood and Pitner returned to the residence, and the five individuals began driving toward Hagerstown, rather than Martinsburg. They pulled over, however, upon seeing another vehicle flashing its lights toward them. The driver of the other vehicle was Youngblood's mother who told Youngblood that she had just learned over her scanner that the police were looking for three women who had called 911. Shortly thereafter, Officer Allen Thomas of the Morgan County Sheriff's Department arrived on the scene. Katara, Kimberly and Wendy indicated to Officer Thomas, however, that they were not the ones who had placed the call. Following the departure of Youngblood's mother and Officer Thomas, Youngblood, angered by the knowledge that the 911 call had been made, allegedly waved the revolver around inside the vehicle and told the three women that, if they had gotten him into trouble, he would kill them. His comments in that regard were particularly directed at Wendy S.

Youngblood then drove the individuals to Pitner's residence, also in the Berkeley Springs area. According to the State, while they were there, Youngblood ordered Karata into a bedroom where, with the revolver in sight, he made Katara resume performing oral sex on him. Later, refusing to take Katara, Kimberly and Wendy to their homes in Martinsburg, Youngblood drove them back to Hagerstown. Katara related the above events to her grandmother, and the police were contacted.

## II.

### Procedural Background

In April 2001, a Morgan County grand jury returned a seven count indictment against appellant Youngblood charging him with a number of offenses with regard to Katara N., Kimberly K. and Wendy S. Trial began on February 25, 2003. Although Youngblood elected not to testify and did not call any witnesses, he argued, through counsel, that the three women made up the allegations against him because they would otherwise have been in trouble with their families for not returning on time from the birthday party.

Nevertheless, at the conclusion of the trial, the jury returned the following verdict: Count 1, guilty of sexual assault in the first degree, a felony, relating to the assault upon Katara N. at Youngblood's residence; Count 2, guilty of sexual assault in the second degree, a felony, relating to the assault upon Katara N. at the Pitner residence; Counts 3 and 4, guilty of brandishing a firearm, misdemeanors, relating to the waving of the revolver at Katara N. and Kimberly K. in Youngblood's vehicle; Count 5, guilty of wanton endangerment involving a firearm, a felony, relating to waiving the revolver at Wendy S. in Youngblood's vehicle; and Count 6, guilty of indecent exposure, a misdemeanor, relating to the sexual assaults upon Katara N.

Thereafter, the Circuit Court denied appellant Youngblood's post-trial motions and pursuant to the order of October 3, 2003, sentenced Youngblood to: (1) 15 to 35 years for sexual assault in the first degree, (2) 10 to 25 years for sexual assault in the second degree, (3) 1 year each for the brandishing and wanton endangerment convictions and (4) 90 days for the indecent exposure conviction.

---

**2.** At trial, both Kimberly K. and Wendy S. testified that Youngblood had the revolver when he left the bedroom.

**3.** Wendy S. testified at trial as follows: "[Youngblood] just stood in front of the car and had his gun pulled, I mean, directly at the windshield towards Joe. Joe parked the car and jumped out and was walking around."

The sentences were ordered to be served consecutively, except for the brandishing and wanton endangerment convictions. Those counts were ordered to be served concurrently with each other but consecutively with the other convictions.

The appeal to this Court was granted in June 2004.

### III.

### Other Act Evidence

During the trial, the jury was allowed to hear testimony from the three women that, while at the Youngblood residence, Youngblood pointed the revolver at Joseph Pitner, thereby stopping him from driving away. Youngblood objected to that testimony upon the ground that it brought evidence of an uncharged, collateral act into the trial in violation of Rule 404(b) of the West Virginia Rules of Evidence. The Circuit Court overruled the objection, finding the testimony to be: (1) descriptive of a portion of a single, extended criminal transaction concerning the three women and (2) intrinsic to the State's theory that the three women felt intimidated by Youngblood throughout all of the events in question.[4]

Rule 404(b) states in part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident [.]

Appellant Youngblood asserts that the Circuit Court committed error in permitting the testimony concerning the pointing of the revolver at Pitner because, in determining whether the testimony was admissible, the Circuit Court failed to conduct the proper analysis required under Rule 404(b) concerning the relevancy of the evidence and its prejudicial effect.[5]

This Court is of the opinion, however, that, in the circumstances of this case, Rule 404(b) does not apply. In *State v. Dennis,* 216 W.Va. 331, 607 S.E.2d 437 (2004), the defendant challenged his convictions of various offenses, including two counts of sexual assault in the second degree, kidnapping and robbery. The alleged victim was the defendant's former girlfriend. One of the assignments of error raised by the defendant related to the admission of evidence of his abusive, harassing and controlling conduct toward the victim in the months prior to the charged offenses. Citing Rule 404(b), the defendant, in *Dennis,* asserted that the evidence was not relevant to the charges and was overly prejudicial to his defense at trial. The trial court ruled, however, that, inasmuch as the evidence was part of the fabric

---

4. During the trial, the Circuit Court gave the following limiting instruction to the jury:

    Ladies and gentlemen of the jury, during the testimony of the witnesses that you have heard so far today and also during testimony that you heard yesterday you may have heard elicited some testimony with regard to presentation or brandishing or some sort of use of a firearm allegedly by Mr. Youngblood allegedly against Mr. Pitner.

    You should be aware there is no charged misconduct and that evidence is elicited only for a limited purpose and you may only consider such evidence for a limited purpose.

    The limited purpose of such evidence would be to the extent that such evidence would tend to establish knowledge on the part of the alleged victim of the presence and intentions with regard to a firearm and what, in any, intimidation that may have engendered. That would be the limited purpose of such evidence not for any broader purpose against Mr. Youngblood or any other capacity.

5. Syllabus point 2 of *State v. McGinnis,* 193 W.Va. 147, 455 S.E.2d 516 (1994), states, in part, that, if a sufficient showing has been made under Rule 404(b) that a criminal defendant has committed certain other crimes, wrongs or acts, "the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence."

    Rule 401 defines the phrase *relevant evidence* as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 402 declares the general admissibility of relevant evidence in court proceedings, and Rule 403 provides that relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice.

of the underlying charges, it was outside the customary Rule 404(b) analysis.

In *Dennis*, this Court affirmed the ruling of the trial court and stated:

> After carefully reviewing the record, we cannot say that the trial court abused its discretion in finding that the prior acts constituted intrinsic evidence, not subject to Rule 404(b) analysis. While the acts were not part of a "single criminal episode" or "necessary preliminaries" to the charged offenses, it is difficult to conclude that the evidence was not necessary "to complete the story of the crimes on trial" or otherwise provide context to the crimes charged.

216 W.Va. at 352, 607 S.E.2d at 458.

■ In so holding, this Court, in *Dennis*, relied, in part, upon syllabus point 1 of *State v. Spicer*, 162 W.Va. 127, 245 S.E.2d 922 (1978), which holds: "Other criminal act evidence admissible as part of the *res gestae* or same transaction introduced for the purpose of explaining the crime charged must be confined to that which is reasonably necessary to accomplish such purpose." *State v. Hutchinson*, 215 W.Va. 313, 321, 599 S.E.2d 736, 744 (2004); syl. pt. 4, *State v. Hager*, 204 W.Va. 28, 511 S.E.2d 139 (1998); syl. pt. 2, *State v. McGhee*, 193 W.Va. 164, 455 S.E.2d 533 (1995). In *Hutchinson*, this Court held that Rule 404(b) did not apply where the "other bad acts" of the defendant, which included threatening to kill various people shortly before the fatal shooting of the victim, constituted intrinsic evidence and were admitted to complete the story culminating in the victim's death. 215 W.Va. at 321, 599 S.E.2d at 744.[6]

Here, the "other act" of appellant Youngblood cannot be viewed in isolation. Youngblood's alleged pointing of the revolver at Pitner precipitated from Kimberly K. and Wendy S. knocking on the bedroom door and stating that Pitner was leaving in the vehicle. As indicated above, both Kimberly and Wendy saw the revolver in Youngblood's possession as he then left the bedroom. Thereafter, Youngblood allegedly used the revolver in the presence of the three women to prevent Pitner from driving away. Pitner did not testify at trial, and it is, therefore, unknown what his intent was in attempting to leave the Youngblood residence. Nevertheless, after Youngblood stopped Pitner, the five ultimately drove to Pitner's residence where, according to the evidence of the State, Katara was sexually assaulted for the second time.

■ Manifestly, the testimony of the pointing of the revolver at Pitner was reasonably necessary within the meaning of *State v. Spicer, supra*, to help explain the events resulting in the indictment against Youngblood. The testimony served to "complete the story" of an extended criminal transaction. Consequently, Rule 404(b) did not apply, and the Circuit Court's admission of the testimony concerning the pointing of the revolver at Pitner was "protected by the parameters of sound discretion." *Parker v. Knowlton Construction Company*, 158 W.Va. 314, 329, 210 S.E.2d 918, 927 (1975).[7]

6. The opinions of this Court in *Dennis* and *Hutchinson* cited the following passage from *State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613 (1996), concerning intrinsic evidence in the context of Rule 404(b):

> In determining whether the admissibility of evidence of "other bad acts" is governed by Rule 404(b), we first must determine if the evidence is "intrinsic" or "extrinsic." *See United States v. Williams*, 900 F.2d 823, 825 (5th Cir.1990): " 'Other act' evidence is 'intrinsic' when the evidence of the other act and the evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged." (Citations omitted) If the proffer fits into the "intrinsic" category, evidence of other crimes should not be suppressed when those facts come in as *res gestae*—as part and parcel of the proof charged in the indictment. *See United States v. Masters*, 622 F.2d 83, 86 (4th Cir. 1980) (stating evidence is admissible when it provides the context of the crime, "is necessary to a 'full presentation' of the case, or is ... appropriate in order 'to complete the story of the crime on trial by proving its immediate context or the *"res gestae"* ' ").

196 W.Va. at 312 n. 29, 470 S.E.2d at 631 n. 29.

7. Because the record supports the conclusion of the Circuit Court that the alleged actions of Youngblood toward Katara N., Kimberly K. and Wendy S. constituted an extended criminal transaction, this Court also affirms the denial of Youngblood's motion to sever the sexual assault charges from the wanton endangerment charges. In considering the motion to sever, the Circuit

## IV.

### The Stun Belt

▮ The trial in this case began on February 25, 2003. That morning, just prior to voir dire, the bailiff informed Youngblood's counsel that Youngblood was wearing a stun belt under his suit jacket for security purposes.[8] Neither Youngblood's counsel nor the prosecutor had previous knowledge that the device was to be employed. Emphasizing that his client had no history of violent or threatening behavior associated with court proceedings, Youngblood's counsel objected to the use of the stun belt and asked the Circuit Court to conduct an evidentiary hearing concerning its necessity.

The Circuit Court indicated that it also had no previous knowledge that the stun belt was to be employed. Nevertheless, the Court ruled that Youngblood would be required to wear the stun belt during the voir dire process because: (1) a large number of people had reported for jury service, and space in the courtroom was limited, (2) the stun belt was underneath Youngblood's jacket and not readily apparent to those in the courtroom and (3) in addition to the charges set for trial, Youngblood was facing a felony murder charge in an unrelated case. The Circuit Court further ruled, however, that Youngblood would not be required to wear the stun belt during the remainder of the trial.[9] As the Circuit Court explained:

> Court viewed all of the charges as interrelated and as parts of the whole picture of the case. As the brief filed by the State in this Court asserts: "The commission of these crimes were interspersed among one another, and the evidence presented was needed to show the complete picture, the 'whole story' of what befell those three young girls. It was for this very reason the Circuit Court ruled against severance of the Counts."
>
> The decision to grant or deny a motion to sever criminal charges for separate trials is a matter within the sound discretion of the trial court. Syl. pt. 1, *State v. Milburn*, 204 W.Va. 203, 511 S.E.2d 828 (1998) *cert. denied*, 528 U.S. 832, 120 S.Ct. 88, 145 L.Ed.2d 75 (1999); syl. pt. 3, *State v. Hatfield*, 181 W.Va. 106, 380 S.E.2d 670 (1988). In this case, the denial of Youngblood's motion to sever was not an abuse of the Circuit Court's discretion.

**8.** The record indicates that the stun belt employed in this case was a belt-like device from which an electric shock could be conveyed to the

First of all, we became aware of it this morning when [the bailiff] ... described that this was a part of his security packet this morning. * * * [Youngblood] is wearing a nice dark business suit and a tie and white shirt, and I understand the procedure outlined to me by [the bailiff], he was allowed to come to the courtroom just with you [his counsel] so that he would not project any degree of custody. * * * [T]his use of this stun belt in that limited setting, I believe, is very justifiable just given the crush of the public and the fact that everybody is intermingling and that the voir dire box is right next to the seat of the defendant, and persons walk right through the heart of the well of the court. * * * [Youngblood] is faced with not only this prosecution, which is two counts of first degree sexual assault which carry with them upon conviction heavy penalties, he also stands charged and pending trial for a count of felony murder [.] * * * So it was very much a crush of people and a very busy morning [during voir dire], yet the defendant was able to be there totally unimpeded by any security measures that would be obvious to any observer. I could see no sign of a security device upon the person of the defendant. I am sure none of the jurors were able to ascertain as much.[10]

When the number of people in the courtroom substantially lessened following the

wearer in the event of a violent outburst in the courtroom. The belt was subject to activation by means of a remote control button held by a law enforcement officer. The belt was never activated in this case.

**9.** The rulings of the Circuit Court were made during two *in camera* hearings, the first conducted immediately prior to the start of voir dire and the second, resulting in the removal of the stun belt, conducted after voir dire was completed. The Circuit Court conducted neither hearing as an evidentiary hearing. However, Youngblood's counsel and the prosecutor were permitted to place comments on the record concerning the employment of the stun belt.

**10.** Counsel for Youngblood, on the other hand, maintains that Youngblood's wearing of a security device was apparent to those in the courtroom because his jacket was somewhat "puffed out."

voir dire process, the Circuit Court ruled that Youngblood would not be required to wear the stun belt during the remainder of the trial.

■ Syllabus point 3 of *State v. Brewster*, 164 W.Va. 173, 261 S.E.2d 77 (1979), states: "A criminal defendant has the right, absent some necessity relating to courtroom security or order, to be tried free of physical restraints." Syl., *State v. Holliday*, 188 W.Va. 321, 424 S.E.2d 248 (1992); syl. pt. 2, *State v. Billups*, 179 W.Va. 353, 368 S.E.2d 723 (1988); syl. pt. 1, *State v. McKinney*, 178 W.Va. 200, 358 S.E.2d 596 (1987). As the opinion in *Brewster* states:

It cannot be doubted that physical restraints on a defendant at trial may create a substantial prejudice against him. Not only may physical restraints suggest to the jury that the defendant is a dangerous and violent person, but they may also suggest that he has engaged in past criminal acts and may lead the jury to infer that he is capable of having committed the crime for which he is being tried.

164 W.Va. at 180, 261 S.E.2d at 81–82.

■ On the other hand, as long recognized, the use of physical restraints or other security precautions, not ordinarily required during a criminal trial, may be warranted in certain circumstances where the safety of the participants and the public would otherwise be compromised. The employment of such restraints and precautions rests within the sound discretion of the circuit court, subject to this Court's admonitions in the past that the circuit court conduct an evidentiary hearing, in advance of trial, to determine whether the circumstances of the case justify greater than normal security measures. In *Brewster*, for example, this Court remanded the case to the trial court for an evidentiary hearing "to determine if there were sufficient facts to warrant trying the defendant in handcuffs." 164 W.Va. at 183, 261 S.E.2d at 83. *See also*, syl. pt. 3, *State v. Allah Jamaal W.*, 209 W.Va. 1, 543 S.E.2d 282 (2000), holding that whether to physically restrain a witness for the defendant at trial is within the discretion of the circuit court; *State v. Holliday, supra*, discussing when physical restraints are justified and emphasizing the

role of the evidentiary hearing; and syl. pt. 6, *State v. Peacher*, 167 W.Va. 540, 280 S.E.2d 559 (1981), recognizing circuit court discretion concerning courtroom security and holding that an evidentiary hearing should be conducted in that regard.

■ In *State v. Linkous*, 177 W.Va. 621, 355 S.E.2d 410 (1987), prospective jurors were in the courtroom just before the beginning of the defendant's murder trial. The defendant arrived in the courtroom handcuffed to another prisoner, and the handcuffs were taken off. Consequently, the defendant's attorney moved for a new jury panel, asserting that the existing panel would be prejudiced by having seen the defendant in handcuffs. The trial court in *Linkous*, however, denied the motion. Upon appeal, this Court affirmed, noting as follows:

This case involves only an initial appearance in handcuffs which were removed shortly after he was brought into the courtroom. Most courts that have dealt with this question conclude that ordinarily it is not reversible error nor grounds for a mistrial to proceed to try a criminal defendant with a jury panel that may have seen him in handcuffs for a brief period of time prior to trial. (citations omitted)

177 W.Va. at 624, 355 S.E.2d at 413. Tracking the above language, syllabus point 2 of *Linkous* holds: "Ordinarily, it is not reversible error nor grounds for a mistrial to proceed to try a criminal defendant with a jury panel that may have seen him in handcuffs for a brief period of time prior to trial." *State v. Carey*, 210 W.Va. 651, 658, 558 S.E.2d 650, 657 (2001); *State v. Billups, supra*, 179 W.Va. at 355–56, 368 S.E.2d at 725–26.

■ In the case now to be determined, we are concerned that neither Youngblood's counsel nor the prosecutor nor the Judge were told by law enforcement personnel prior to the proceedings that Youngblood would be wearing the stun belt. Although Youngblood's counsel stated to the Circuit Court that his client's suit jacket appeared to be somewhat "puffed out," the record indicates that the presence of the stun belt was first made known through the disclosure of

the bailiff immediately prior to voir dire. Such undisclosed actions by law enforcement personnel undermine the authority of a circuit court to exercise its discretion upon the necessity of the physical restraint in judicial proceedings before it. As this Court noted in *State v. Peacher, supra,* the discretion concerning the employment of physical restraints and various security precautions during a criminal trial "is the court's and must be exercised, not delegated" 167 W.Va. at 560, 280 S.E.2d at 573. Moreover, as this Court said in *Brewster:* "Since the preliminary decision to use physical restraints is ordinarily made by the custodial authorities, the State must share the burden of advising the court on this issue in advance of the trial, so that a proper record can be made." 164 W.Va. at 182 n. 5, 261 S.E.2d at 82 n. 5.

Nevertheless, without compromising the above principles, this Court is of the opinion that the circumstances herein do not warrant the granting of relief to appellant Youngblood. Here, after conducting two *in camera* hearings, the Circuit Court concluded that Youngblood would wear the stun belt during the voir dire process and not during the remainder of the trial. In so ruling, the Circuit Court did not simply adopt the plan of the custodial authorities. Instead, the Court placed upon the record: (1) a description of Youngblood's clothing, (2) the Court's observation that the stun belt was not readily apparent under his suit jacket and (3) the fact that Youngblood was facing an unrelated charge of felony murder in addition to the charges for which he was indicted in this case.

Moreover, the Circuit Court stated on the record that Youngblood entered the courtroom without shackles and without law enforcement officers in close proximity to him and that, therefore, the stun belt had served to preclude the jury from making improper inferences about Youngblood in terms of the security measures utilized at trial. Finally, the Circuit Court commented, at length, about the relative smallness of the courtroom where the trial would be conducted and the security problems it posed in the face of 68 individuals reporting for jury service that morning plus other individuals present that day.

Although an evidentiary hearing should have been conducted as requested by Youngblood's counsel, this Court concludes that, in view of the reasons set forth by the Circuit Court during the *in camera* hearings, the limited wearing of the stun belt herein did not rise to the level of an abuse of the Circuit Court's discretion. Accordingly, this assignment of error is without merit.[11]

V.

Remaining Assignments of Error

Appellant Youngblood also assigns as error certain matters concerning: (1) the State's chain of custody with regard to Katara N.'s blood sample, (2) the Circuit Court's limits on the cross-examination of Katara concerning her psychological counseling records, (3) Youngblood's motion for a judgment of acquittal as to Count 2 charging sexual assault in the second degree and (4) Youngblood's motion for a new trial based upon newly discovered evidence. A careful review of the

---

**11.** In *People v. DuPree,* 353 Ill.App.3d 1037, 289 Ill.Dec. 784, 820 N.E.2d 560 (2004), a criminal defendant was required to wear a stun belt during his trial. Noting that the evidence against the defendant was overwhelming and that the stun belt was not clearly visible in the courtroom, the Appellate Court of Illinois stated: "The trial court's failure to conduct a hearing on the necessity of the stun belt as a restraint for the defendant did not contribute to his conviction, and thus the plain error doctrine is inapplicable and the error has been procedurally defaulted." 289 Ill.Dec. 784, 820 N.E.2d at 566, 567.

It should be noted that a number of cases from other states concerning the employment of stun belts in the courtroom can be found in S.R.

Shapiro, Annotation, *Propriety and Prejudicial Effect of Gagging, Shackling or Otherwise Physically Restraining Accused During Course of State Criminal Trial,* 90 A.L.R.3d 17 (Supplement—June 2004), at sec. 21.5. While the results in those cases vary depending upon the circumstances, two general factors relating to appellate review can be discerned: (1) the degree to which the trial court, rather than law enforcement alone, considered the appropriateness of using the stun belt in the courtroom and (2) the extent to which the trial court's reasons for allowing the stun belt to be employed were set forth upon the record. In the opinion of this Court, those factors are best developed at the trial court level by means of an evidentiary hearing.

record, however, demonstrates that those matters rested largely within the discretion of the Circuit Court. Therefore, this Court finds those assignments to be without merit.

■ During the trial, the State called Trooper H.B. Myers of the West Virginia State Police Crime Laboratory. Trooper Myers, an expert witness, indicated that, based upon DNA testing, blood samples taken from Youngblood and Katara N. and evidence obtained from the Pitner residence, was consistent with the State's assertion that Katara spat Youngblood's semen into the trash can at the Pitner residence. Youngblood objected to that testimony, however, upon the ground that the State failed to identify the hospital nurse who drew the blood sample from Katara N. The objection was overruled.

The evidence of the State at trial revealed that the nurse in question took Katara's blood sample in the presence of Trooper Jeffrey C. Weaver who delivered it to Trooper Charles Platt. Trooper Platt placed the sample in a temporary evidence locker. Soon after, Katara's blood sample was sent by Trooper A.T. Peer to the Crime Laboratory. In overruling Youngblood's objection concerning the identity of the nurse, the Circuit Court stated: "The Court is persuaded that since the Officer testified that the sample was taken of Ms. [N.] in his presence . . . there seems to the Court to be at least sufficient indicia of trustworthiness to allow the evidence to stand before the jury and let the jury make what they will out of it."

■ This Court finds the reasoning of the Circuit Court persuasive and declines to grant appellant Youngblood relief upon this issue. In syllabus point 2 of *State v. Davis*, 164 W.Va. 783, 266 S.E.2d 909 (1980), this Court said: "The preliminary issue of whether a sufficient chain of custody has been shown to permit the admission of physical evidence is for the trial court to resolve. Absent abuse of discretion, that decision will not be disturbed on appeal." Syl. pt. 8, *State v. Young*, 173 W.Va. 1, 311 S.E.2d 118 (1983). *See also,* W.Va. R. Evid. 901 concerning authentication and identification of evidence.

■ The next assignment concerns the Circuit Court's limits on Youngblood's cross-examination of Katara N. with regard to her psychological counseling records. Specifically, in 2002, Katara received counseling services from psychologist Bridget Magnetti at Eastridge Health Systems in Martinsburg, West Virginia. The Circuit Court reviewed the records *in camera*, and disclosed portions of the material to the State and Youngblood's counsel. Youngblood's counsel then moved that he be permitted to cross-examine Katara from the records to show: (1) that, to receive attention, she once lied to her boyfriend by telling him that she was pregnant, (2) that she had worked as an exotic dancer and (3) that she had a history of displaying manipulative behavior. In addition, Youngblood's counsel expressed his intent to call Ms. Magnetti during the trial to testify that Katara's manipulative behavior was the result of a mental disorder.

When Katara N. took the stand, the Circuit Court allowed Youngblood's counsel, on cross-examination, to bring out testimony concerning the faking of the pregnancy. However, the Circuit Court ruled that no cross-examination of Katara would be permitted as to her working as an exotic dancer or as to her history of manipulative behavior as reflected in the counseling records. Moreover, the Circuit Court ruled that Youngblood would not be permitted to call Bridget Magnetti as a witness because Ms. Magnetti had never specifically diagnosed Katara with any disorder relating to manipulative behavior.

■ Syllabus point 4 of *State v. Carduff*, 142 W.Va. 18, 93 S.E.2d 502 (1956), holds: "The extent of the cross-examination of a witness is a matter within the sound discretion of the trial court; and in the exercise of such discretion, in excluding or permitting questions on cross-examination, its action is not reviewable except in case of manifest abuse or injustice." Syl. pt. 12, *State v. McIntosh*, 207 W.Va. 561, 534 S.E.2d 757 (2000); syl. pt. 1, *State v. Allman*, 182 W.Va. 656, 391 S.E.2d 103 (1990). *See also,* W.Va. R. Evid. 611.

■ Here, the evidence indicates that Katara N. did not become an exotic dancer

until two years after the alleged offenses in this case occurred. Therefore, evidence of her exotic dancing was irrelevant and would, possibly, have been prejudicial at trial. Moreover, as the Circuit Court stated, no specific diagnosis of any disorder relating to Katara's alleged manipulative behavior had ever been made. Thus, there was no basis upon which to cross-examine Katara from her counseling records, or to call Ms. Magnetti as a witness, on that point. As the brief of the State filed with this Court states: "Katara [N.'s] mental health records only contained information regarding a counseling course, with no actual diagnosis which might affect Katara [N.'s] credibility contained within those records [.]" Consequently, this Court finds no error with regard to Youngblood's contentions relating to Katara N.'s counseling records.[12]

█ Youngblood also assigns as error the failure of the Circuit Court to grant his motion for a judgment of acquittal with regard to Count 2 which charged sexual assault in the second degree. As *W.Va.Code*, 61–8B–4 (1991), states, in part, a person is guilty of sexual assault in the second degree when such person "engages in sexual intercourse or sexual intrusion with another person without the person's consent, and the lack of consent results from forcible compulsion [.]" The phrase "forcible compulsion" is defined in *W.Va.Code*, 61–8B–1 (2000), as including: "Threat or intimidation, expressed or implied, placing a person in fear of immediate death or bodily injury to himself or herself or another person or in fear that he or she or another person will be kidnapped [.]" Here, the offense of sexual assault in the second degree allegedly occurred in a bedroom at the Pitner residence.

According to Youngblood, the State relied upon the theory that he forced Katara N. to perform oral sex upon him at the Pitner residence by threatening not to drive her home. Youngblood asserts that that evidence, even if true, was not sufficient to sustain his conviction under Count 2 because such a threat cannot constitute "forcible compulsion" as a matter of law.

Appellant Youngblood, however, inaccurately describes the State's theory. In comments made to the Circuit Court during the trial and in final argument, the prosecutor argued that forcible compulsion under Count 2 was shown, not only by evidence that Youngblood threatened not to drive Katara home, but also by evidence that Katara was aware throughout the events in question that Youngblood had a revolver. Katara specifically testified that, in addition to seeing the weapon earlier, Youngblood had the revolver out while at the Pitner residence. Thus, this Court is of the opinion that, considering the presence of the weapon in addition to the threat not to drive Katara home, the evidence of the State concerning forcible compulsion was sufficient with regard to Youngblood's conviction of sexual assault in the second degree.

█ As syllabus point 1 of *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995), states:

> The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

Syl. pt. 2, *State v. Rogers*, 209 W.Va. 348, 547 S.E.2d 910 (2001). *See also*, syl. pt. 1, *State v. Jackson*, 215 W.Va. 188, 597 S.E.2d 321 (2004).

---

**12.** In syllabus point 5 of *State v. Harman*, 165 W.Va. 494, 270 S.E.2d 146 (1980), this Court held:

"Evidence of psychiatric disability may be introduced when it affects the credibility of a material witness' testimony in a criminal case. Before such psychiatric disorder can be shown to impeach a witness' testimony, there must be a showing that the disorder affects the credibility of the witness and that the expert has had a sufficient opportunity to make the diagnosis of psychiatric disorder."
Syl. pt. 13, *McIntosh, supra*.

■ The final assignment of error raised by appellant Youngblood concerns the failure of the Circuit Court to grant him a new trial based upon newly discovered evidence.

Following the trial, Youngblood's investigator uncovered the existence of a one-page, handwritten note apparently left at the Pitner residence by one or more of the three women. The note, addressed to Joseph Pitner, is full of obscenities and states that the women vandalized certain items in the Pitner home. The note says, for example, that detergent was poured in the milk and that unclean material was put in the ice cream. In the margin of the note was a statement to appellant Youngblood indicating that "Katara said thanks" for the oral sex performed upon her (in contrast to, as the State's evidence suggested, the oral sex performed upon Youngblood). According to Youngblood, the note was exculpatory, would have influenced the jury and should have warranted the granting of a new trial.

In September 2003, the Circuit Court conducted an evidentiary hearing concerning the note and concluded that it was, in effect, impeachment evidence which would not justify the granting of a new trial. Specifically, the Circuit Court stated that the apparent purpose of the note was to insult Pitner and Youngblood and that its import was not exculpatory with regard to Youngblood's actions toward Katara N. As the Circuit Court stated: "The Court would however in looking at the note not see it as an act of gratitude or thankfulness for receipt of sexual attention but sees it as rather a spiteful or vindictive act or in this rather bitter irony a get-back for an offense is what the note appears to read."

■ A review of the record confirms that the author of the note was never determined. Inasmuch as it refers to Katara N. in the third-person, the note was apparently written by either Kimberly K. or Wendy S., or both. Nor, contrary to the note, does the record contain evidence suggesting that Youngblood performed oral sex upon Katara N. Accordingly, this Court cannot say that the Circuit Court abused its discretion in denying Youngblood a new trial upon the basis of the note. As stated in the syllabus point of *State*

*v. Frazier,* 162 W.Va. 935, 253 S.E.2d 534 (1979):

"A new trial will not be granted on the ground of newly-discovered evidence unless the case comes within the following rules: (1) The evidence must appear to have been discovered since the trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained. (2) It must appear from facts stated in his affidavit that plaintiff was diligent in ascertaining and securing his evidence, and that the new evidence is such that due diligence would not have secured it before the verdict. (3) Such evidence must be new and material, and not merely cumulative; and cumulative evidence is additional evidence of the same kind to the same point. (4) The evidence must be such as ought to produce an opposite result at a second trial on the merits. (5) And the new trial will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side." Syllabus Point 1, *Halstead v. Horton,* 38 W.Va. 727, 18 S.E. 953 (1894) [*overruled, in part, on other grounds in State v. Bragg,* 140 W.Va. 585, 87 S.E.2d 689 (1955) ].

Syl. pt. 1, *State v. Crouch,* 191 W.Va. 272, 445 S.E.2d 213 (1994); syl. pt. 1, *State v. O'Donnell,* 189 W.Va. 628, 433 S.E.2d 566 (1993).

## VI.

### Conclusion

Upon all of the above, the final order of the Circuit Court of Morgan County entered on October 3, 2003, is affirmed.

Affirmed

Justice STARCHER dissents and reserves the right to file a dissenting opinion.

Justice DAVIS dissents and reserves the right to file a dissenting opinion.

Justice MAYNARD concurs and reserves the right to file a separate opinion.

DAVIS, J., dissenting:

(Filed July 8, 2005)

In this proceeding, the defendant, Denver A. Youngblood, was convicted of two counts of sexual assault, three counts of wanton endangerment and one count of indecent exposure. Mr. Youngblood assigned numerous grounds for reversal and a new trial. The majority opinion rejected each assignment of error.[1] One of the issues raised by Mr. Youngblood was that the State suppressed exculpatory and impeachment evidence. I believe that this issue had merit and required reversal of the judgment and a new trial. Consequently, for the reasons set out below, I respectfully dissent.

*The State Suppressed and Attempted to Destroy Material Exculpatory and Impeachment Evidence*

In this appeal, Mr. Youngblood contended that the State suppressed exculpatory and impeachment evidence. In rejecting this issue, the majority opinion cited limited facts surrounding the matter. In order to understand the true significance of the assignment of error, I will set out all the facts relevant to this assignment of error.

The offenses charged against Mr. Youngblood occurred in two settings: at his home and at the home of Joe Pitner. Several days after the offenses occurred, State Trooper Peer conducted a crime scene investigation at the home where Mr. Pitner resided. During that crime scene investigation, the owner of the home, Patricia Miles (Mr. Pitner's aunt), gave Trooper Peer a notebook that contained a writing made by one of the two girls who were with the victim, Katara, at the

time of the offenses. The writing, addressed to Mr. Pitner, stated the following:[2]

This is for Joe! Only!

IMPORTANT

You can read it if you want!

How do you like what we did to your house!

You just got played!

In the long Run, you was the one who got f* * * * *!

Throw everything away in your medicine cabinet!

Milk does a body good with TIDE!

F* * * you * * *holes!!!!!

I hope they kick you out

*Katara said Thanks for eating her p* * * * Denver [Mr. Youngblood]*

Hope you love the pictures

Clean the microwave

I Brushed my a* * with all of yall's tooth Brushes!

Don't eat the ice cream because it has my p* * * * smell all in it!

Don't ever talk sh* * about me because pay backs are a b* * * *!!!

You smoked my boogers B* * * *!

(Emphasis added).[3]

During a hearing on the post-trial motion in this case, Ms. Miles testified that Trooper Peer told her to destroy the writing. Specifically, Ms. Miles stated: "I gave him the notebook. It was in the notebook, it wasn't like this, it was in the notebook. I actually gave it to him and he read it and he said just throw everything away." Ms. Miles' statement was corroborated by her daughter, Tammy Miles, who was present at the time.

---

1. In passing, I will note that the disposition of the stun belt assignment of error should have referenced to the recent decision in *Deck v. Missouri*, — U.S. —, —, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005). In *Deck*, the United States Supreme Court held that:

[T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial. Such a determination may of course take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.

*Deck*, — U.S. at —, 125 S.Ct. at 2012. I make no comment as to whether the majority's disposition of the stun belt issue was consistent with the principles set out in *Deck*.

2. I must point out that the language in the writing is highly offensive. However, I feel compelled to set out the writing as it was written, because any redaction would detract from the force of the writing's materiality.

3. Because this writing was suppressed by the State, Mr. Youngblood has not had an opportunity to determine, through a handwriting expert or an admission, which girl wrote the note.

Tammy stated: "He told her just to go ahead and ... throw the notebook away." Trooper Peer testified that he did not recall the incident.

Ms. Miles, apparently believing the writing had some significance, did not throw it away. However, Mr. Youngblood did not learn about the writing until after the trial. When the writing was shown to Mr. Youngblood, he moved for a new trial based upon newly discovered exculpatory and impeachment evidence that the state suppressed and attempted to destroy. The trial court, without any substantive analysis, denied the motion on the grounds that it was merely "impeachment evidence which would not justify the granting of a new trial." The majority opinion tersely affirmed the trial court's ruling without performing any meaningful analysis.

One of the fundamental principles engraved in Anglo–American criminal jurisprudence is that no person should be convicted of a crime without having a fair trial. To ensure that a criminal defendant receives a fair trial, the State and Federal constitutions have guaranteed defendants specific undeniable rights. Among those constitutional rights is the guarantee that the State cannot intentionally destroy or withhold exculpatory evidence. This Court has said on several occasions that " '[i]n the context of criminal trials, it is without question that it is a constitutional violation of a defendant's right to a fair trial for a prosecutor to withhold or suppress exculpatory evidence.' " *State v. Salmons*, 203 W.Va. 561, 572, 509 S.E.2d 842, 853 (1998) (quoting *Lawyer Disciplinary Bd. v. Hatcher*, 199 W.Va. 227, 232, 483 S.E.2d 810, 815 (1997)).[4] Indeed, we held in sylla-

bus point 4 of *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982), that "[a] prosecution that withholds evidence which if made available would tend to exculpate an accused by creating a reasonable doubt as to his guilt violates due process of law under Article III, Section 14 of the West Virginia Constitution." Our holding in *Hatfield* was a recognition of the pronouncement made by the Unites States Supreme Court in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The decision in *Brady* made clear that "the suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97. *See also Illinois v. Fisher*, 540 U.S. 544, 547, 124 S.Ct. 1200, 1202, 157 L.Ed.2d 1060 (2004) ("We have held that when the State suppresses or fails to disclose material exculpatory evidence, the good or bad faith of the prosecution is irrelevant: a due process violation occurs whenever such evidence is withheld.").[5] It has been held that "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).[6] Finally, "[w]hen the police intentionally destroy evidence, it is a natural inference that it was destroyed because it may have been exculpatory and, hence, prejudice has been caused to defendant." *State v. Schmid*, 487 N.W.2d 539, 542 (Minn.Ct.App.1992).[7]

---

**4.** *See* note 7, *infra* for a discussion of a prosecutor's obligation to learn of any favorable evidence known to all persons, such as police officers working on the government's behalf.

**5.** A "bad faith" showing is necessary when a *Brady* violation involves "the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Arizona v. Youngblood*, 488 U.S. 51, 57, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988). The facts in the instant case do not implicate the rule in *Arizona*.

**6.** In the decision of *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), it

was held that "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles*, 514 U.S. at 434, 115 S.Ct. at 1565. All that is required is a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435, 115 S.Ct. at 1566.

**7.** It is not relevant for a *Brady* violation that the police, rather than a prosecutor, destroyed or suppressed material exculpatory or impeachment evidence. A violation by the police is imputed to the prosecutor. The United States Supreme

Applying the foregoing principles to the facts of this case clearly establishes a violation of *Brady* and its progeny.

The majority opinion points out that Katara testified that Mr. Youngblood forced her to perform oral sex on him initially at his home. After this assault took place, Mr. Youngblood left the home with Mr. Pitner. Katara and her two friends thereafter left the home and made a 911 call from a nearby home. During the 911 call, the girls reported that they had been abducted by Mr. Youngblood. After making the call, the three girls returned to Mr. Youngblood's home. Mr. Youngblood and Mr. Pitner subsequently returned. Mr. Youngblood informed the girls that he would take them back to Hagerstown. During the drive to Hagerstown, Mr. Youngblood's mother was driving her car and flashed her lights to have Mr. Youngblood pull over. Mr. Youngblood's mother informed him that she was listening to a CB-scanner and heard a report that he had abducted three girls. Neither Katara, nor the other two girls, informed Mr. Youngblood's mother that they had been abducted and that Katara had been sexually assaulted. While Mr. Youngblood's mother was speaking to him, a police officer drove up. The police officer questioned Mr. Youngblood. While this interrogation was taking place, none of the three girls informed the police officer that they had been abducted and that Katara had been sexually assaulted. The police officer, finding nothing wrong, drove off. Katara testified that Mr. Youngblood then drove to Mr. Pitner's home. While at

Mr. Pitner's home, Mr. Youngblood allegedly again forced Katara to perform oral sex on him.

The bizarre facts set out above were heard by the jury and the jury convicted Mr. Youngblood. The conviction rested upon the fact that no evidence was available to seriously draw into question whether consensual sex had occurred. However, such evidence existed. It existed in the writing that Trooper Peer told Ms. Miles to destroy. That writing indicated that, contrary to Katara's testimony, she and Mr. Youngblood both performed oral sex on each other. This was the impeachment value of the evidence.[8] This was the consensual exculpatory value of the evidence. The circuit court and the majority opinion found this evidence to be impeachment evidence only, and therefore, found it did not warrant a new trial. *Brady* and its progeny teach differently.

I believe the writing provided both exculpatory and impeachment evidence. However, assuming for the sake of argument that the writing was purely impeachment evidence, under *Brady* and its progeny, due process still required its disclosure. Professor Cleckley has pointed out that "a new trial is warranted for a *Brady* violation ... where the defendant can establish that the prosecution failed to disclose favorable evidence, *including favorable impeachment evidence* [.]" 1 Franklin D. Cleckley, *Handbook on West Virginia Criminal Procedure* at 249 (2d ed. Supp.2004) (emphasis added). *See also State v. Hoard,* 180 W.Va. 111, 375 S.E.2d 582 (1988) (granting new trial because state sup-

Court made this point clear in *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995):

> [T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation, the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.
> ... Since, then, the prosecutor has the means to discharge the government's *Brady* responsibility if he will, any argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor,

and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials.

*Kyles,* 514 U.S. 419 at 437–38, 115 S.Ct. 1555, at 1567–68, 131 L.Ed.2d 490. *See* Franklin D. Cleckley, *Handbook on West Virginia Criminal Procedure,* 249 (2d ed. Supp.2004) ("A prosecutor's Brady disclosure duty ... includes material that is known only to police investigators and not to [the] prosecutor; an individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf.")

8. The majority opinion noted that there was no evidence at trial showing Mr. Youngblood performed oral sex on Katara. The evidence was nonexistent because the state concealed the evidence. That was the basis of Mr. Youngblood's argument for a new trial.

**552**

pressed impeachment evidence). In fact, the United States Supreme Court has expressly "disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes[.]" *Kyles v. Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995). *See also Spicer v. Roxbury Corr. Inst.,* 194 F.3d 547, 555 (4th Cir.1999) (noting that there are "[t]hree 'essential components' [to] a *Brady* violation . . .:(1) the evidence must be favorable to the defendant, whether directly exculpatory or of impeachment value; (2) it must have been suppressed by the state, whether willfully or inadvertently; and (3) it must be material.").

The record established after the trial unequivocally showed that, during a "crime scene" investigation, a State Trooper gave instructions to destroy crime scene evidence. I do not believe that any defendant, no matter how conclusive his/her guilt, should be the victim of the intentional destruction or suppression of favorable material evidence. Our system of justice simply cannot operate in this manner if it is truly to be a system of justice. *See State v. Osakalumi,* 194 W.Va. 758, 461 S.E.2d 504 (1995) (reversing a first degree murder conviction because the state destroyed potentially useful defense evidence).

In view of the foregoing, I respectfully dissent.

STARCHER, J., dissenting:

(Filed July 12, 2005)

I concur fully with Justice Davis's well-reasoned separate opinion on the evidentiary issue, but I dissent and write separately on another issue: the use of a stun belt.

On the stun belt issue, the majority essentially concludes that any error by the trial court in allowing the use of the stun belt was harmless. I would apply a strict standard and would presume both harm and reversible error from the use of a stun belt without proper procedures first being used by the court to evaluate its propriety.

Stun belts are fearful and exceptionally coercive devices that should be used only in the most extraordinary situations, and only after the most thorough procedures by the court. The leading cases on the use of stun belts are *U.S. v. Durham,* 287 F.3d 1297 (2002) and *People v. Mar,* 28 Cal.4th 1201, 124 Cal.Rptr.2d 161, 52 P.3d 95 (2002). I believe that this Court would adopt the holdings of these cases. It would probably behoove circuit courts, prosecutors, and defense counsel to cleave to these cases' teachings.

Accordingly, I dissent.